920 P.2d 391

STATE of Idaho, Plaintiff–Appellant,

v.

Michael D. HOWLEY, aka Skip, and Charles Allen Kelly and Joy Ellen DeSanctis, aka Joy Ellen DiStefano, and Carmine J. DeSanctis, Defendants–Respondents.

No. 20985.

Supreme Court of Idaho,
Boise, February 1996 Term.

June 21, 1996.

Alan G. Lance, Attorney General; and Daniel Goldberg (argued), Special Deputy Attorney General, Boise, for appellant.

Wiebe and Fouser, Caldwell; Nevin, Kofoed & Herzfeld, Boise; Ellison M. Matthews, Boise, for respondents. David Z. Nevin argued.

McDEVITT, Chief Justice.

This is a criminal case on interlocutory appeal regarding the State's motion in limine to disallow the defense of necessity. The State filed this interlocutory appeal, arguing that the district court erred in denying its motion in limine on the grounds that the elements for the defense of necessity were not supported by the record and transcript which have been presented, pursuant to stipulation, on appeal. We reverse the district court's denial of the State's motion in limine and remand.

## I.

## BACKGROUND AND FACTS

On November 20, 1991, at approximately 8:30 p.m., Laverne Collins–Macchio was forcibly abducted from her Boise home. Collins–Macchio was 39 years old and was the primary caretaker of four children. Collins–Macchio had just put her four boys to bed and changed into her nightgown, when at approximately 8:30 p.m. the door bell rang. Collins–Macchio and three of her boys responded to the door bell. Collins–Macchio peered out the peephole of her door and saw a man standing with a pizza box. Collins–Macchio then opened the door because she thought that the pizza man had made a mistake and brought her another pizza; Collins–Macchio had ordered a pizza for dinner earlier that night. The pizza man told Collins–Macchio that he had her pizza, to which Collins–Macchio responded that she did not order another pizza and that there must have been a mistake. The pizza man kept pushing the pizza, which had a receipt with her name on it, towards Collins–Macchio and Collins–Macchio kept denying it was her pizza. When Collins–Macchio decided she would accept the pizza and reached out to take the pizza, the pizza man grabbed her by the arm and pulled her out of the doorway. Collins–Macchio and her children began screaming in fright and Collins–Macchio yelled to her children to call the police. Collins–Macchio's son Roy tried to call the police but was unable to because the respondents had disconnected Collins–Macchio's phone service.[1]

Another man grabbed Collins–Macchio and the two men forced Collins–Macchio into a van that had pulled into Collins–Macchio's driveway. Collins–Macchio did not know either of the two men who forced her into the van. Collins–Macchio was terrified.

As the two men forced Collins–Macchio into the awaiting van, Collins–Macchio's sister Patricia Cox ran from a neighbor's home, located across the street from Collins–Macchio's home, into Collins–Macchio's home to take care of the children. Collins–Macchio did not see Cox as Collins–Macchio was forced away from her home and into the van.[2]

Once Collins–Macchio was in the van, she was forced to lie face down, with the two men on top of her, and their hands over her mouth. The men eventually let Collins–Macchio sit up on the floor of the van and gave her a coat and socks. The van was driven by a third man to a cabin in the McCall area that Collins–Macchio had never been to before. The three men who abducted and drove Collins–Macchio to the cabin in the McCall area were the respondents Michael

---

1. Steven Macchio, Collins–Macchio's current husband, reported Collins–Macchio's possible abduction to the police on the night of the abduction, November 20, 1991.

2. Collins-Macchio was never allowed to speak to her children from the time of her abduction until she was released on November 27, 1991. Collins–Macchio was informed that her husband at the time, Ross Collins, was caring for them.

D. Howley, Charles Allen Kelly, and Carmine J. DeSanctis.

Upon arriving in the McCall area, Collins–Macchio was taken by the arms and escorted into a cabin by two of the male respondents. Upon entering the cabin, Collins–Macchio met a woman named Joy DeSanctis, who is also a respondent in this case. Collins–Macchio was informed later that night (November 20, 1991), that Collins–Macchio's mother was the person who set up Collins–Macchio's abduction.[3] Collins–Macchio had bruises on her chin (where the men had grabbed her mouth as they were taking her out of her home), arm, and leg, that were in the shape of fingers.[4]

The following morning, November 21, 1991, Collins–Macchio overheard Joy talking with Coelho on the phone, and went downstairs to try to talk to Coelho. Joy ordered the men to take Collins–Macchio back upstairs as Joy and Collins–Macchio were wrestling over the phone and Collins–Macchio was screaming to Coelho for help. Collins–Macchio was transported later in the morning of November 21, 1991, to McCall and then to the Nampa/Caldwell area. While in McCall, Collins–Macchio waved her arms pleading for help from another person, which angered the respondents sitting beside her, who then pulled her down into the seat and held her down. The respondents forced Collins–Macchio to lie flat on her stomach on the floor of the van for the trip down to the Nampa/Caldwell area (except for a lunch break), due to Collins–Macchio's efforts to get help. A foam pad was added to the wood floor of the van for the trip from McCall to the Nampa/Caldwell area.

When the van arrived in the Nampa/Caldwell area, two of the male respondents took Collins–Macchio's arms and walked her into a motel room. One of the men told Collins–Macchio to walk straight into the room and not to give them anymore problems. Collins–Macchio showered and received a change of clothes while in the Nampa/Caldwell motel room.

Coelho and Cox arrived at the Nampa/Caldwell motel the night of November 21, 1991. Coelho told Collins–Macchio not to try to escape. Another woman arrived at the Nampa/Caldwell motel that night and told Collins–Macchio the purpose of Collins–Macchio's abduction was to talk about Collins–Macchio's church, the Church Universal and Triumphant (church).

Collins-Macchio did not spend the night of November 21, 1991, at the Nampa/Caldwell motel. Collins–Macchio was transported from the Nampa/Caldwell motel to the Boise area in a van with the three male respondents, while lying face down on the floor of the van. Collins–Macchio did not know where in Boise she had been taken. The respondents, Coelho, Cox, and the woman who wanted to talk about Collins–Macchio's church, all joined Collins–Macchio in a Boise hotel room the night of November 21, 1991. Cox slept with Collins–Macchio in the bed, Coelho slept on the floor by the window, and one of the male respondents slept by the door. The following nights the other two male respondents slept on the floor by the

---

**3.** It is undisputed that Collins–Macchio's mother, Laverne Coelho, was responsible for hiring the respondents and the deprogrammers to abduct Collins–Macchio and attempt to deprogram her. Cox assisted Coelho in organizing Collins–Macchio's abduction and attempted deprogramming. Coelho and Cox testified that they feared for the safety of Collins–Macchio and Collins–Macchio's children, based upon their belief that Collins–Macchio would take the children and move to a dangerous bomb shelter in Montana that was owned by Collins–Macchio's church. Coelho and Cox believed that there were numerous guns and ammunition stored at the church bomb shelter located in Montana.

There was no testimony to support Coelho and Cox's assertion that Collins–Macchio had immediate plans to move to a bomb shelter owned by Collins–Macchio's church in Montana. The testimony regarding Collins–Macchio's plans to move to Montana was that, "maybe someday we'll move" to Bozeman. There was no evidence introduced that indicated Collins–Macchio had plans to move to a bomb shelter in Montana that was owned by the church. Collins–Macchio explained that she and her children had visited a friend in Bozeman, Montana, and that Collins–Macchio's children liked the Bozeman area. Bozeman, Montana, is about 60 to 90 miles from the church bomb shelter.

**4.** Collins-Macchio was never physically abused and was given regular, daily meals by the people who abducted her.

window and Coelho slept in the living room area.

Collins-Macchio never left the Boise hotel room between November 21, 1991 (Thursday night) and November 26, 1991 (Tuesday). From November 22, 1991 through November 26, 1991, Collins–Macchio was served her meals inside the Boise hotel room and listened to (or tried not to listen to) lectures given by a number of individuals Collins–Macchio did not know. These individuals will be collectively referred to as "deprogrammers." Collins–Macchio described these lectures as "interrogations" which lasted all morning, afternoon, and night, with breaks for breakfast, lunch, and dinner. The interrogations "mocked" Collins–Macchio's religion and the people involved in her religion. Collins–Macchio responded to these interrogations, stating that it was the teachings that she followed, and not a person or place that she followed.

Collins-Macchio asked whether the deprogramming exercises could be completed before Thanksgiving, which was on the following Thursday. Collins–Macchio was told that if she entered a dialogue with the deprogrammers, it would make the exercises go faster. Consequently, Collins–Macchio tried to engage in dialogue with the deprogrammers. By the end of November 22, 1991 (Saturday), Collins–Macchio knew that she was not going to be able to agree with the deprogrammers and that she had "had it." On November 22, 1991, Saturday night, Collins–Macchio tried (unsuccessfully) to persuade a guard to let her go. On Sunday, November 23, 1991, Collins–Macchio asked one of the deprogrammers if she could go because Collins–Macchio had listened to a couple of days of the deprogrammers' lectures and did not want to listen anymore. A deprogrammer responded that the deprogrammers had an agenda and that they wanted to follow it. Collins–Macchio did not speak to her mother, was very upset, and ignored the deprogrammers' lectures and video tapes on Sunday, November 23, 1991. Although Collins–Macchio made it clear on Sunday that she was not listening and was upset, the deprogrammers continued with their presentation Monday, which Collins–Macchio continued to ignore.

Collins-Macchio was moved from the Boise hotel room, where she had been staying since Friday night, November 21, 1991, to another hotel room in Boise, on Tuesday, November 26, 1991. Collins–Macchio spent Tuesday night, November 26, 1991, at the Boise hotel.

The following morning, Wednesday, November 27, 1991, Collins–Macchio was released. Collins–Macchio's parents drove Collins–Macchio to her Boise residence. When Collins–Macchio arrived at her residence she was very angry. Collins–Macchio called a detective, whose card was left for Collins–Macchio at her home. The police came to Collins–Macchio's home and Collins–Macchio told the police what happened. Collins–Macchio agreed to go to the police station, where she decided she wanted to press charges against the people who had abducted her. Collins–Macchio did not want to press charges against Coelho and Cox because she thought they were victimized. Collins–Macchio felt that Coelho and Cox did not fully understand what Collins–Macchio's life was like because they did not see her that often (both Coelho and Cox lived in California) and that Coelho and Cox had been given bad information.

## II.

## PRIOR PROCEEDINGS

On December 19, 1991, an indictment was issued, accusing Joy and Carmine DeSanctis of a felony crime of kidnapping in the second degree. On March 19, 1992, an indictment was issued, accusing Michael Howley and Charles Kelly of a felony crime of kidnapping in the second degree. Each of the respondents plead not guilty. On October 26, 1992, the district court ordered that the two cases, arising from the two above-named indictments, be consolidated for a joint trial.

The State made a motion in limine to exclude the defense of necessity. The district court denied the State's motion. The parties then stipulated as follows:

a. The Court's decision to permit the necessity defense in this case should be appealed by the State to the Idaho Appellate Courts on an interlocutory basis. . . .

c. In the event the Idaho Appellate Courts accept the interlocutory appeal and rule that the district court correctly decided to permit the necessity defense, the case will be resolved in the district court by the defendants' guilty pleas to misdemeanors. . . .

d. In the event the Idaho Appellate Courts accept the interlocutory appeal and rule that the district court incorrectly decided to permit the necessity defense, the case will be resolved in the district court by the defendants' guilty pleas to felonies. . . .

The parties further stipulated that the identical testimony regarding factual matters relevant to the necessity defense would have been presented in this case, had this case gone to trial, that was presented in the district court case *State v. Chrnalogar*. Thus, the parties agreed that this appeal would be resolved upon the record and full transcript in *State v. Chrnalogar*.

On September 21, 1993, the district court entered an order granting the parties' stipulated motion for permissive appeal, pursuant to I.A.R. 12. On November 12, 1993, the Idaho Supreme Court granted permission to appeal.

## III.

### STANDARD OF REVIEW

■ The question of whether there is a reasonable view of the evidence that supports an instruction to the jury on the defense of necessity is matter of discretion for the district court. *See State v. Johnson*, 126 Idaho 892, 895, 894 P.2d 125, 128 (1995) ("It is within the trial court's discretion to determine whether to submit a defendant's requested instruction to the jury . . . ."); *cf. State v. Grube*, 126 Idaho 377, 381, 883 P.2d 1069, 1073 (1994) (holding district court did not abuse its discretion in determining there was no reasonable view of the evidence to support the requested lesser offense instruction); *State v. Thomasson*, 122 Idaho 172, 175, 832 P.2d 743, 746 (1992) (holding it is a discretionary act of the district court in determining whether to give an instruction on a lesser offense).

## IV.

### THERE IS NO REASONABLE VIEW OF THE EVIDENCE THAT WOULD SUPPORT AN INSTRUCTION ON THE DEFENSE OF NECESSITY

■ The State argues that the district court abused its discretion in denying the State's motion in limine to exclude the defense of necessity, asserting that the respondents failed to present sufficient evidence to support a jury instruction on the defense of necessity. We agree.

Idaho Code § 19–2132 addresses what jury instructions are appropriate in a given case. A court instructing a jury "must state . . . all matters of law necessary for their information." I.C. § 19–2132(a). Either party may present to a court any written instruction and request that such instruction be given to the jury. I.C. § 19–2132(a). If a court thinks the instruction is "correct and *pertinent*, it must be given; if not, it must be refused." I.C. § 19–2132(a) (emphasis added).

In *State v. Eastman*, 122 Idaho 87, 831 P.2d 555 (1992), this Court adopted a four part analysis to determine whether a requested jury instruction was properly denied: (1) identify the specific elements necessary for the requested instruction; (2) define the statutory elements, or as in this case, the common law elements of the requested instruction; (3) consider the evidence presented to determine whether such evidence supports the requested instruction; and (4) if the requested instruction is not supported by the evidence, the court must reject the requested instruction. *Eastman*, 122 Idaho at 89–90, 831 P.2d at 557–58 ("A defendant's requested instruction need not be given if it was . . . not supported by the facts of the case.") *Cf. State v. Fodge*, 121 Idaho 192, 195, 824 P.2d 123, 126 (1992) (interpreting I.C. § 19–2132(b) and holding that if there is a reasonable view of the evidence presented in the case to support a finding of a lesser offense an instruction should be given); *see also State v. Johns*, 112 Idaho 873, 881, 736 P.2d 1327, 1335 (1987) ("[R]efusal of defen-

dant's requested instructions allegedly dealing with his defense theory is not error where that proposed statement is ... not supported by the evidence...."").

In *State v. Hastings,* 118 Idaho 854, 801 P.2d 563 (1990), this Court held that the common law defense of necessity is recognized in Idaho, pursuant to I.C. § 73–116. *Hastings,* 118 Idaho at 856, 801 P.2d at 565. The *Hastings* Court set forth Idaho's definition of the defense of necessity:

1.  A specific threat of immediate harm;
2.  The circumstances which necessitate the illegal act must not have been brought about by the defendant;
3.  The same objective could not have been accomplished by a less offensive alternative available to the actor;
4.  The harm caused was not disproportionate to the harm avoided.

*Hastings,* 118 Idaho at 855, 801 P.2d at 564.

In *Hastings* the defendant presented evidence at the district court level that indicated she suffered from rheumatoid arthritis and that she used marijuana to control the pain and muscle spasms associated with her disease. *Id.* at 855, 801 P.2d at 564.

■ When reviewing on appeal an exercise of the district court's discretion, we consider: (1) whether the district court correctly perceived the issue as one of discretion; (2) whether the court acted within the boundaries of such discretion and consistently with any legal standards applicable to specific choices; and (3) whether the district court reached its decision upon an exercise of reason. *Grube,* 126 Idaho at 381, 883 P.2d at 1073.

In the present case, there is no reasonable view of the evidence that would support an instruction to the jury on the defense of necessity. The respondents have failed to show any specific threat of immediate harm that existed at the time Collins–Macchio was abducted. Unlike the defendant in *Hastings,* the respondents in the present case have failed to come forward with evidence that would indicate the respondents were acting to avoid a reasonably perceived specific threat of immediate harm. The evidence introduced by the respondents was that:

(1) Collins–Macchio was only contemplating moving to Bozeman, Montana sometime in the future, and

(2) that Bozeman, Montana was 60 to 90 miles away from the church bomb shelter that allegedly contained many guns and ammunition.

■ Thus, the evidence in this case does not support the contention that Collins–Macchio had the intention of moving to a place in Montana that would pose a specific threat of immediate harm to Collins–Macchio or her children. We hold that the possibility of harm at an indeterminate date in the future, is insufficient to satisfy the first element of the necessity defense, a specific threat of immediate harm.

While the lack of a specific threat of immediate harm precludes the defense of necessity, we also note that the evidence in this case was clear that Coelho and Cox's objective could have been accomplished by a less offensive alternative that was available to them. The record clearly indicates that no alternative efforts were made to avoid the necessity of abducting Collins–Macchio.

The district court's denial of the State's motion in limine is contrary to I.C. § 19–2132(a) and Idaho case law. The defense of necessity is not supported by the evidence in this case. We hold that the district court should have granted the State's motion in limine to exclude the defense of necessity.

## V.

## CONCLUSION

We reverse the decision of the district court denying the State's motion in limine to exclude the defense of necessity and remand the case for further proceedings, consistent with this opinion. We award costs to the appellant.

JOHNSON, TROUT, SILAK and SCHROEDER, JJ., concur.