951 P.2d 1249

STATE of Idaho, Plaintiff–Respondent,

v.

Daniel BUSH, Defendant–Appellant.

Nos. 23115, 23122.

Supreme Court of Idaho,
Idaho Falls, September 1997 Term.

Dec. 22, 1997.

Kim W. Claussen, Pocatello, for defendant–appellant.

Alan G. Lance, Attorney General, L. LaMont Anderson, Deputy Attorney General, Boise, for plaintiff–respondent. L. LaMont Anderson, argued.

SILAK, Justice.

This is an appeal from a judgment of conviction and sentence after a jury found appellant Daniel Bush (Bush) guilty of forcible sexual penetration by use of a foreign object, an infamous crime against nature and lewd conduct with a minor child under the age of sixteen. We affirm.

## I.

## FACTS AND PROCEDURAL BACKGROUND

On May 3, 1995, fifteen-year old J.S. was living with his mother, B.S., at their residence in McCammon, Idaho, where they had lived for the previous five years. J.S. was awakened on that morning at approximately 4:00 a.m. He turned on the light and saw a man standing in his bedroom wearing a black t-shirt, blue jeans or blue sweat pants, and an orange knit cap on his head. The man was later identified as Bush, who had rented this same house from B.S. and her husband between 1987 and 1990. J.S. was able to see Bush's face immediately prior to the cap being pulled over his face. Bush turned the light off and began fondling J.S.'s penis. After beating J.S. with his fists, Bush placed J.S.'s penis in his mouth for five to ten minutes.

Bush then forced J.S. on a couch in J.S.'s bedroom. J.S. refused Bush's demand that J.S. engage in fellatio. J.S. was pushed to his knees where a t-shirt was tied around his face. Bush then tied J.S.'s arms behind his back with a Nintendo cord and a clock cord, and again placed J.S.'s penis inside his mouth for approximately five to ten minutes. At this point, J.S. was able to get a second look at Bush and noticed a tattoo on his arm of an eagle or some other kind of bird.

Bush then took J.S. downstairs to the kitchen, made him lie down on the floor on a blanket, and then said he was going upstairs to see J.S.'s mother. Bush threatened to kill J.S. if he moved. However, J.S. was able to free his arms from the cords, ran out of the house to his car and drove to the Flying J truck stop where he called 911.

Officer Fonnesbeck responded to the 911 call at the Flying J and asked J.S. if he knew

the identity of his attacker. Fonnesbeck testified at trial that J.S. responded, "I don't know his name, but I believe that he used to live in our house up here." J.S. was questioned a couple of hours later by another police officer, Officer Thomas, when J.S. was returned to a neighbor's house. Officer Thomas testified that J.S. gave a description of his attacker and identified him as "a guy that used to rent our house, that my parents used to rent to." When asked who it was, J.S. said "Dan Bush." When asked if J.S. was sure it was Bush, he responded, "well, he certainly looks like Dan." After being transported to the hospital, J.S. was questioned a third time about the identity of his attacker. Detective Vollmer testified that J.S. stated that the attacker "looked like the man that used to rent from his dad and his name was Dan Bush." Detective Hickman testified that after J.S. identified his attacker as Bush while at the hospital, Hickman returned to the sheriff's office where he found a 1990 photograph of Bush. Hickman testified that he then returned to the hospital and showed the photograph to J.S. Hickman stated that J.S.'s response was "this looks like the person only he's a little older and has a little more gray hair."

B.S. testified she was also awakened during the night by an intruder standing over her bed. When she asked what he wanted, Bush told her to shut up or he would kill her and began beating her with his fists. B.S. described Bush, including his dark clothing and orange cap which was not pulled down over his face until after B.S. was able to observe his facial features while he was approximately two feet away. B.S. testified that she had a "real strong feeling that [her attacker] knew me and I kept trying to figure out who the person was."

After beating B.S. into submission, Bush had her turn onto her stomach, removed her pajama bottoms and forced his finger into her vagina. Forcing a second finger into her vagina, Bush repeatedly penetrated B.S.'s vagina for approximately five minutes. As Bush became more sexually aroused, B.S. believed she was going to be raped and asked if he had a condom. Bush told B.S. not to move and left the room. When Bush came back into the room, B.S. ran past him, down the stairs and out the door to the neighbor's house where she called 911.

While at the neighbor's house, B.S. was interviewed by police. She gave a description of her attacker, including his clothing. B.S. testified that while at the neighbor's house, and after she had calmed down, she had concluded her attacker was Bush. She stated at trial:

> I put together my feeling that he knew me based on his actions of not beating me totally to death before sexually assaulting me. My observation that this person knew the home in the dark, knew to bend over by my bedside, could get up and down the stairs quietly, the size and the stature, and somewhat looking at—remembering looking at his face brought me to think of Dan Bush.

At the hospital, B.S. gave a more detailed description and further explained to Detective Vollmer that Bush's "physique was like the man that had rented from them before."

Later that day, Bush was apprehended by a SWAT team after being found hiding in the rafters of a residential garage in McCammon. Bush was subsequently taken to the hospital where his clothing was seized and pictures were taken of scratches and bruises on his back, neck and arm.

In June 1995, Bush was originally charged with three felony counts: (I) battery with intent to commit a serious felony, I.C. § 18–911; (II) lewd conduct with a minor under sixteen, I.C. § 18–1508; and (III) an infamous crime against nature, I.C. § 18–6605. Thereafter, Bush filed a motion to dismiss claiming that counts II and III involving J.S. were a continuous course of the same act. Bush argued that a conviction of both counts would constitute double jeopardy in violation of I.C. § 18–301 and the Idaho and United States Constitutions. At a hearing held in October 1995, the State agreed to amend the information to reflect that count II occurred

on the bed and count III occurred on the couch. The district court denied Bush's motion to dismiss, concluding that the conduct charged in counts II and III comprised two distinct acts which allegedly occurred at different times and locations.

At the same hearing, Bush made an oral motion to dismiss count I, pertaining to B.S., claiming there was insufficient evidence presented at the preliminary hearing. Based upon the State's subsequent motion to amend the information, the district court dismissed count I without prejudice, and in November 1995, an amended information was filed charging forcible sexual penetration by use of a foreign object. In March 1996, an indictment was filed charging forcible sexual penetration by use of a foreign object involving the same facts as those charged in count I of the original information. All three charges were consolidated for trial.

Bush filed a motion in limine to preclude use of his prior felony convictions at trial. The district court ruled that Bush's 1972 conviction for delivery of a controlled substance could not be used at trial. However, the court further ruled that Bush's 1993 Wyoming conviction for immoral acts with a child could be admitted for impeachment if Bush testified.

Bush moved to suppress J.S.'s pretrial and trial identification of Bush, claiming that showing J.S. a single photo tainted his identification. Bush further sought suppression of tire and shoe imprint castings and expert testimony relating to identification of the castings based upon the failure of the police to adequately "secure" the crime scene from the time the imprints were discovered until the castings were made. The district court denied Bush's motion regarding both the tire and shoe imprint castings and J.S.'s pretrial and trial identification of Bush.

Prior to trial, Bush submitted a set of jury instructions that included a *Holder* instruction. During the jury instruction conference, Bush requested that the *Holder* instruction be given. The district court denied Bush's request.

Following trial, the jury found Bush guilty of all three counts. The district court sentenced Bush to a unified forty-five years with twenty-five fixed for count I, forcible sexual penetration by use of a foreign object; a fixed life sentence without the possibility of parole for count II, lewd conduct with a minor under sixteen; and a unified fifty-five years with twenty-five years fixed for count III, an infamous crime against nature. The district court ordered the sentences to be served concurrently. Bush appeals.

## II.

### ISSUES ON APPEAL .

1. Whether the district court erred in allowing J.S.'s identification of Bush after the single photo showup.

2. Whether the district court erred in ruling that Bush could be cross-examined about a prior Wyoming conviction for immoral acts with a child if Bush testified at trial.

3. Whether the district court erred by refusing to give a *Holder* instruction.

4. Whether the district court erred in ruling that there was sufficient evidence to sustain the jury verdict of guilty on each count.

5. Whether the district court erred in failing to dismiss either the infamous crime against nature charge or the lewd and lascivious conduct with a minor charge if both arose from the same conduct and were one continuing act.

6. Whether the district court erred in denying Bush's motion to suppress tire and shoe imprint evidence.

7. Whether the district court imposed illegal or excessive sentences.

## III.

### ANALYSIS

**A. The District Court Did Not Err In Allowing J.S.'s Identification Of Bush After The Single Photo Showup.**

Bush argues that the identification of Bush by J.S. based upon a single photograph

showup, and his subsequent in-court identification, should have been suppressed because the photographic identification was impermissibly suggestive.

### 1. Standard of review.

█ The standard of review for a motion to suppress is two-fold. The appellate court will not overturn the trial court's factual findings unless they are clearly erroneous. However, the application of constitutional standards to the facts found by the district court is given free review. *State v. Julian,* 129 Idaho 133, 135, 922 P.2d 1059, 1061 (1996).

### 2. Because J.S.'s identification of Bush possessed sufficient aspects of reliability, the district court correctly ruled that the identification should not be suppressed.

█ Although this Court has acknowledged that single-subject showups are suspect and generally not condoned, the Court has also followed the United States Supreme Court in holding that due process does not require suppression of an in-court identification unless it is tainted by an out-of-court identification that is "so suggestive that there is a very substantial likelihood of misidentification." *State v. Hoisington,* 104 Idaho 153, 161, 657 P.2d 17, 25 (1983) (quoting *State v. Crawford,* 99 Idaho 87, 103, 577 P.2d 1135, 1151 (1978)). In so holding, this Court relied on the standards set forth in *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), and *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The Court in *Hoisington* held that "there will not be a very substantial likelihood of misidentification as long as the identification possesses sufficient aspects of reliability." 104 Idaho at 161, 657 P.2d at 25. *Hoisington* employed a "totality of the circumstances" test to determine the reliability of a suggestive identification. Relying again on *Manson v. Brathwaite, supra,* and *Neil v. Biggers, supra,* the Court set forth five factors to be considered under this test:

(1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of his prior description of the criminal, (4) the level of certainty demonstrated at the identification, and (5) the length of time between the crime and the identification.

104 Idaho at 162, 657 P.2d at 26. The Court concluded that based upon an evaluation of those factors, if there are aspects of reliability sufficient enough to outweigh the tainting effect of the suggestive identification, the admission of such identification testimony will not violate due process. *Id.* We address each factor below.

### a. *The opportunity of the witness to view the perpetrator.*

The district court found that J.S. had several opportunities to view his assailant during the attack. At the preliminary hearing, J.S. testified that when he was first awakened and turned on the light, Bush's cap was pulled down over his face to his chin. J.S. later testified on cross-examination that when Bush put his mouth on J.S.'s penis, Bush lifted the cap up above his eyebrows. J.S. further testified on cross-examination that when Bush was tying him up with the Nintendo cords, the light was on, the cap was up, and he saw Bush's face for "a couple of seconds." On cross-examination, J.S. testified that the cap came completely off when Bush grabbed the cords off the wall.

Additionally, on direct examination, J.S. gave a substantially accurate description of Bush, *i.e.,* he was Caucasian, had graying dark hair with a receding hairline, and a gray mustache, that he was wearing either dark blue jeans or sweatpants and a black t-shirt, and that he had a tattoo on his arm in the biceps area.

At trial, J.S. testified that the first opportunity he had to see his attacker's face was when J.S. first turned on the light by his bed. He stated that when he turned the light on the cap was sitting on top of Bush's head. J.S. then described Bush's hair as dark but

going gray. J.S. testified that he viewed Bush again when he was tied up. J.S. stated that he told the officer who arrived at the truck stop, Officer Fonnesbeck, that his attacker might be "the person we used to rent to." On cross-examination, J.S. testified that the light was on two times. The first time was when J.S. first woke up. At that time the cap was above Bush's eyebrows for thirty seconds. J.S. saw Bush's face during that time. J.S. testified that the second time the light was on was when he was being tied up on the couch. J.S. had a short glimpse of Bush's face for a "split second" when he was on the couch.

Thus, the district court correctly concluded that J.S. had ample opportunity to view Bush.

### b. *The witness's degree of attention.*

J.S. specifically stated that he had an opportunity to observe Bush's face. He also gave an accurate physical description of Bush, his clothing and tattoo. The district court noted that the very nature of the crime against J.S. would have gripped J.S.'s attention. A victim of crime, as opposed to a casual observer, has more reason to be attentive to the circumstances and to an attacker's appearance. *United States v. Follette,* 428 F.2d 912, 915 (2d Cir.1970), *cert. denied,* 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970); *see also State v. Hoisington,* 104 Idaho at 163, 657 P.2d at 27. The district court correctly found J.S.'s degree of attention was well-focused.

### c. *The accuracy of the witness's prior description.*

Prior to being shown the photograph of Bush, J.S. identified and described Bush three different times. When Officer Fonnesbeck arrived at the Flying J truck stop in response to the 911 call, J.S. stated that he thought his attacker was someone who used to live in his parents' house. Shortly afterwards, when J.S. had gone to the neighbor's house where his mother was, he gave a physical description to Officer Thomas and stated that he believed his assailant was a man who used to rent their house. J.S. also described Bush's physical characteristics accurately in his written statement. All of these identifications occurred before J.S. was shown the photograph of Bush later that morning at the hospital.

### d. *The level of certainty demonstrated by the witness.*

When J.S. was shown Bush's photo, he responded that "this looks like the person only he's a little older and has a little more gray hair." Bush claims that this statement shows J.S.'s lack of certainty. However, since Bush's photograph was five years old at the time it was shown to J.S., his response was reasonable. Thus, the district court correctly ruled that although J.S. could have used more positive language, he said nothing to indicate uncertainty in the identification.

### e. *The length of time between the crime and the identification.*

J.S. was shown Bush's photo approximately four hours after the crime occurred. Bush admits that this is not an unduly lengthy period of time. In *Hoisington,* the identification occurred five months after the crime, and in *Biggers,* seven months after the crime. Thus, it is reasonable that the description of his attacker would still be fresh in J.S.'s mind only four hours after the crime occurred. The district court therefore correctly ruled that after four hours, J.S. still had an "adequately clear recollection of the events to enable him to recognize the Defendant's photograph."

In applying the above factors under the totality of the circumstances test, we hold that there are sufficient aspects of reliability in J.S.'s identification of Bush to outweigh any alleged suggestiveness that may have been present as a result of the single photo being shown to J.S. The district court did not err in refusing to suppress J.S.'s identification of Bush.

**B. The District Court Did Not Err In Ruling That Bush Could Be Cross–Examined About A Prior Wyoming Conviction For Immoral Acts With A Child If Bush Testified At Trial.**

Bush argues that the district court exceeded the limits of I.R.E. 609 by ruling

that the State could impeach Bush's credibility by introducing evidence of a Wyoming conviction for immoral acts with a child. The district court ruled "that evidence of the fact of conviction in 1993 in Wyoming of the felony of Immoral Acts With A Child will be permitted for impeachment purposes" if Bush testified, but "evidence of facts and circumstances of the nature of the felony will not be permitted."

■ Rule 609 provides, in pertinent part:

(a) General rule. For the purpose of attacking the credibility of a witness, evidence of the fact that the witness has been convicted of a felony and the nature of the felony shall be admitted if elicited from the witness during cross-examination or established by public record, but only if the court determines in a hearing outside the presence of the jury that the fact of the prior conviction or the nature of the prior conviction, or both, are relevant to the credibility of the witness and that the probative value of admitting this evidence outweighs its prejudicial effect to the party offering the witness.

I.R.E. 609(a). Thus, two questions must be answered in determining whether evidence of a prior conviction should be admitted: (1) whether the evidence is relevant to the credibility of the witness; and (2) whether the probative value of the evidence outweighs the unfair prejudicial effect to the party offering the witness.

### 1. Relevance.

■ Preliminarily, we note our standard of review. The trial court's determination whether evidence is relevant is reviewed under a *de novo* standard. *State v. Raudebaugh*, 124 Idaho 758, 766, 864 P.2d 596, 604 (1993).

In *State v. Ybarra*, 102 Idaho 573, 634 P.2d 435 (1981), this Court identified three categories of felonies to determine whether a prior conviction could be used for impeachment, each having different degrees of probative value on the issue of credibility:

"Some, such as perjury, are intimately connected with that issue; others, such as robbery and burglary, are somewhat less relevant; and ... '[a]cts of violence ... generally have little or no direct bearing on honesty and veracity'."

*Ybarra*, 102 Idaho at 580–81, 634 P.2d at 442–43 (quoting *People v. Rollo*, 20 Cal.3d 109, 141 Cal.Rptr. 177, 181, 569 P.2d 771, 775 (1977)). With respect to the second category, *Ybarra* noted:

"On the other hand robbery, larceny, and burglary, while not showing a propensity to falsify, do disclose a disregard for the rights of others which might reasonably be expected to express itself in giving false testimony whenever it would be to the advantage of the witness. If the witness had no compunction against stealing another's property or taking it away from him by physical threat or force, it is hard to see why he would hesitate to obtain an advantage for himself or friend in a trial by giving false testimony. Furthermore, such criminal acts, although evidenced by a single conviction, may represent such a marked break from sanctioned conduct that it affords a reasonable basis of future prediction upon credibility ..."

102 Idaho at 581, 634 P.2d at 443 (quoting Ladd, *Credibility Test—Current Trends*, 89 Univ.Pa.L.Rev. 166, 180 (1940)).

In the present case, the district court ruled that evidence of the fact of Bush's prior conviction was relevant for impeachment purposes. Although prior case law has never specifically decided whether lewd conduct with a minor is the type of crime which bears on the honesty and veracity of a defendant's testimony, the district court placed this crime in the middle category of crimes based upon the foregoing case law. The district court analyzed the Wyoming statute under which Bush was convicted, and determined that the crime of Immoral Acts With A Child is not a "violent felony" crime as that phrase is defined by Wyoming law, nor is it a crime of impulse or passion. Wyo. Stat. Ann. § 14–3–105; *Cooley v. State*, 885 P.2d 875 (Wyo.

1994). Thus, the court ruled that it could not fall within the third category described in *Ybarra*, which are crimes having little or no direct bearing on honesty or veracity. The court concluded that this crime fell within the second category, and that it had at least some bearing on credibility and a general relationship to honesty.

■ We agree with the district court. The determination whether evidence of a particular felony conviction is relevant to credibility depends on the particular facts and circumstances of each case and must therefore be decided on a case-by-case basis. A sex crime against a minor does not specifically relate to honesty or veracity as does the crime of perjury, and therefore, does not fall within the first category described in *Ybarra*. Further, the sex crime involved here is not defined in Wyoming law as a violent felony, and therefore does not fall within the third category described in *Ybarra*. Thus, we conclude that under the specific facts of this case, the Wyoming crime falls within the middle category described in *Ybarra*, *i.e.*, a crime which, while not directly showing a propensity to falsify, does disclose a disregard for the rights of others which one might reasonably expect to express itself in giving false testimony if such would be advantageous to the witness. Since Bush had no compunction against engaging in immoral acts with a minor, there is no reason to believe that he would hesitate to gain an advantage for himself in this case by giving false testimony. Committing an immoral act with a minor is the type of "marked break from sanctioned conduct that [ . . . ] affords a reasonable basis" for predicting credibility. *Ybarra*, 102 Idaho at 581, 634 P.2d at 443.

Thus, we hold that the district court did not err in ruling that the Wyoming conviction was relevant for impeachment purposes if Bush testified.

## 2. Probative value.

■ The determination of whether the probative value of evidence of a prior conviction outweighs its prejudicial effect is reviewed under an abuse of discretion standard. When reviewing an exercise of discretion on appeal, this Court conducts the following inquiry: (1) whether the lower court correctly perceived the issue as one of discretion; (2) whether the court acted within the outer bounds of such discretion and consistently with legal standards applicable to specific choices; and (3) whether the court reached its decision by an exercise of reason. *State v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989). In its written opinion on this issue, the district court noted that it had discretion to admit evidence of Bush's prior conviction of immoral acts with a child.

■ In weighing the probative value of the prior conviction evidence against its prejudicial effect, the district court concluded that no unfair prejudice would occur. The district court noted that because both crimes were similar, whatever shock value the prior conviction might normally have had on a jury would have been largely eliminated by the State's presentation of its case-in-chief involving the acts of forced oral copulation and digital penetration. Moreover, the district court's ruling would have limited the prejudicial impact by permitting only evidence of the fact of conviction of the felony of Immoral Acts With A Child, and excluding evidence of facts and circumstances, such as the exact nature of the act. The court thus followed the second two components of the *Hedger* test by acting within the outer boundaries of its discretion and consistently with legal standards, and by exercising reason in reaching its decision. The court did not abuse its discretion in concluding that any prejudicial effect of the prior conviction would have been substantially outweighed by the probative value of the evidence on the issue of Bush's credibility.

The district court's ruling that evidence of Bush's prior felony conviction could be used for impeachment if Bush testified is affirmed.

## C. The District Court Did Not Err By Refusing To Give A *Holder* Instruction.

Bush argues that the district court erred by not giving a requested *Holder* instruction

to the jury pursuant to *State v. Holder*, 100 Idaho 129, 594 P.2d 639 (1979).

### 1. Standard of review.

 The question whether a reasonable view of the evidence supports an instruction to the jury is a matter left within the discretion of the trial court. *State v. Howley*, 128 Idaho 874, 878, 920 P.2d 391, 395 (1996). However, the question whether the jury instructions, when considered as a whole, fairly and adequately present the issues and state the applicable law, is a question of law over which this Court exercises free review. *State v. Zichko*, 129 Idaho 259, 264, 923 P.2d 966, 971 (1996).

### 2. The district court correctly denied Bush's request for a *Holder* instruction.

 Bush argues that the district court erred by refusing to give Defendant's Requested Instruction No. 14, a *"Holder"* instruction, with respect to J.S.'s identification of Bush. The requested instruction provided:

> You cannot find the defendant guilty of the crimes charged unless the circumstances proved by the evidence are consistent with the theory that the defendant is guilty of those crimes and they cannot be reconciled with any rational theory of the defendant's innocence. If the evidence is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to the defendant's innocence, it is your duty to adopt that interpretation which points to the defendant's innocence, and to reject the other which points to the defendant's guilt. In addition, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt.

In *Holder*, this Court held that such an instruction should not have been refused since, in that case, the evidence presented by the State was entirely circumstantial. 100 Idaho at 132–33, 594 P.2d at 642–43.

In the present case, Bush claims that the evidence of identity is entirely circumstantial because the State's alleged direct evidence of identification is so weak as to be negligible. This argument is wholly without merit. J.S. testified at both the preliminary hearing and at trial that he had at least two opportunities to observe Bush's face. Both J.S. and B.S. identified Bush as the person who had previously rented their house. Further, at the jury instruction conference, Bush's attorney even admitted that "this case does have eyewitness identification and, therefore, is not entirely circumstantial...." Thus, because the State's case involved direct evidence, and was not entirely circumstantial, we affirm the district court refusal to give the *Holder* instruction.

### D. The Trial Court Did Not Err In Ruling There Was Sufficient Evidence To Sustain The Jury's Verdict Of Guilt Against Bush On Each Count.

Bush claims that his conviction was not supported by substantial and competent evidence because of the alleged weak identification evidence. This argument is without merit.

### 1. Standard of review.

 When this Court determines whether to uphold a conviction on appeal, it gives

> full consideration to the right of the jury to determine the credibility of witnesses, the weight to be afforded evidence, as well as the right to draw all justifiable inferences from the evidence before them. But, at the same time, judicial review requires that we peruse that evidence to determine whether a reasonable mind would conclude that the defendant's guilt as to each material element of the offense was proven beyond a reasonable doubt.

*State v. DeGrat*, 128 Idaho 352, 355, 913 P.2d 568, 571 (1996) (quoting *State v. Erwin*, 98 Idaho 736, 740, 572 P.2d 170, 174 (1977)).

 On a complaint of insufficiency of evidence, the appropriate standard of review

is whether there is substantial and competent evidence to support the jury's verdict. *State v. Aragon,* 107 Idaho 358, 366, 690 P.2d 293, 301 (1984). Further, the function of the appellate court is to examine the supporting evidence, not to reweigh the significance of the evidence as it relates to specific elements. *Id.* All facts and inferences are to be construed in favor of upholding the lower court's decision. *Id. See also State v. Filson,* 101 Idaho 381, 386, 613 P.2d 938, 943 (1980) (where there is competent evidence to sustain a verdict, the reviewing court will not reweigh·that evidence).

### 2. Substantial evidence supported the jury's finding that Bush was the perpetrator who committed the sexual assaults against J.S. and B.S.

█ Bush argues that the identification evidence in this case is circumstantial, and that there is no other evidence in the record that showed Bush was at the victims' residence that night. This is not the case.

As stated above, the identification of Bush was by eyewitness testimony and was not tainted by the showing of Bush's photograph to J.S. J.S. had already identified Bush as the person who used to rent their house on at least three separate occasions before being shown the photograph. B.S. also identified Bush as her attacker after she had fled to the neighbor's house.

In addition to this direct identification evidence, the State also presented circumstantial evidence regarding Bush's identification. First, pursuant to DNA expert testimony, fingernail scrapings that were taken from B.S. and compared to a blood sample taken from Bush showed that the scrapings contained DNA from two individuals and that Bush could not be excluded as one of them. Second, there was expert testimony that shoe and tire imprints located outside of the victims' residence on the day of the assaults could not be excluded from shoes that were taken from Bush or from the tires of his wrecked vehicle found only a short distance

from the home. Third, a police officer testified that he passed a vehicle that matched the description of Bush's vehicle at approximately 4:36 a.m., and that he observed a male driver who matched Bush's description. Fourth, there was evidence that Bush's vehicle was found wrecked a short distance from the home, and Bush was found hiding in the rafters of a residential garage. Finally, various articles of Bush's clothing were introduced into evidence at trial. The clothing was identified by the victims as being identical or similar to the clothing worn by the assailant.

Thus, we hold that there was sufficient evidence to support the jury's findings of guilt on all three counts in this case.

### E. The District Court Did Not Err In Refusing To Dismiss Either The Infamous Crime Against Nature Charge Or The Lewd Conduct With A Minor Charge As These Charges Were Based On Separate And Distinct Acts.

Bush argues that his right against double punishment under the Double Jeopardy Clauses of the United States and Idaho Constitutions has been violated because he was charged with both lewd conduct with a minor and an infamous crime against nature. Bush claims that he should not have been convicted of both these crimes since the conduct involved was one continuous act of fellatio on a fifteen-year-old boy. This argument is without merit.

### 1. Standard of review.

█ Questions of law are given free review by the appellate courts. *State v. Larios,* 125 Idaho 727, 728, 874 P.2d 538, 539 (1994). Whether a defendant has been placed in jeopardy twice is a question of law. *State v. Reichenberg,* 128 Idaho 452, 454, 915 P.2d 14, 16 (1996).

### 2. Bush's rights regarding double jeopardy were not violated because the State was required to prove additional facts regarding the sexual assault on the couch.

█ In *State v. Major,* 111 Idaho 410, 725 P.2d 115 (1986), this Court addressed the

issue of whether a course of criminal conduct constitutes one offense or several, and held that it depends on "whether or not the conduct constituted separate, distinct and independent crimes." 111 Idaho at 414, 725 P.2d at 119. The Court further held that this determination requires an inquiry into the circumstances of the conduct and consideration of the "intent and objective of the actor." *Id.*

In *State v. Grinolds,* 121 Idaho 673, 827 P.2d 686 (1992), this Court specifically addressed whether two acts of sexual assault constituted one continuous crime or separate and distinct crimes. Grinolds was charged with two counts of rape. Another person raped the victim between the two times that Grinolds raped her. In concluding there was substantial evidence to support the finding that there were two separate and distinct acts of rape, the Court noted there was evidence presented that Grinolds had intercourse with the victim in the bedroom then left the bedroom, went to the living room for an unspecified period of time, subsequently returned to the bedroom and engaged in the second act of sexual intercourse. 121 Idaho at 675, 827 P.2d at 688.

The present case is similar to *Grinolds.* The first sexual assault took place on J.S.'s bed. The second assault took place on J.S.'s couch. The amended information clearly required proof of these different facts. Further, other events occurred in between these acts of sexual assault. After the first assault, J.S. was pulled off the bed and thrown onto the couch where Bush told J.S. he wanted J.S. to engage in fellatio. J.S. refused and was pushed to his knees and Bush tied a t-shirt around J.S.'s face. Bush again placed J.S. on the couch and tied his arms behind his back with a cord. It was after these events that the second act of sexual assault occurred. Bush then again placed J.S.'s penis in his mouth for five to ten minutes. These facts appear to demonstrate that there were two separate and distinct sexual assaults committed on J.S.

Bush's reliance on *State v. Estes,* 111 Idaho 423, 725 P.2d 128 (1986), is misplaced. In that case, Estes had intercourse with a woman four times in a hotel room. Estes was charged with only one count of rape, and he argued that this rendered the information inadequate requiring dismissal because I.C.R. 8 requires that each crime be charged in a separate count. 111 Idaho at 427, 725 P.2d at 132. This Court disagreed, holding that: "although four acts of sexual penetration occurred, they were part of one continuing transaction. The separate penetrations were not separate acts at different times, in different places, with different actors or circumstances." *Id.* Double jeopardy was not an issue in *Estes,* and is further distinguishable because the present case did involve separate acts in different places.

Thus, we hold that Bush's convictions for lewd conduct with a minor and infamous crime against nature did not violate the Double Jeopardy Clauses of the United States or the Idaho Constitutions.

**F. The District Court Did Not Err In Denying Bush's Motion To Suppress Tire And Shoe Imprint Evidence.**

Bush argues that the tire and shoe imprint evidence presented by the State should have been suppressed because there was no testimony or foundation provided that when the imprints were taken the ground was in the same condition as when the tracks were found. This argument is without merit.

**1. Standard of review.**

 The trial court has broad discretion in the admission of evidence, and its judgment will be reversed on appeal only when there has been an abuse of discretion. *State v. Zichko,* 129 Idaho 259, 264, 923 P.2d 966, 971 (1996). Whether evidence admitted by the trial court is supported by a proper foundation is reviewable under an abuse of discretion standard. *State v. Hagedorn,* 129 Idaho 155, 160, 922 P.2d 1081, 1086 (Ct.App. 1996). The admissibility of evidence purporting to be in substantially the same condition when offered as it was when the crime was committed is also a matter within the discre-

tion of the trial court. *Id.* at 160–61, 922 P.2d at 1086–87.

**2. The district court properly exercised its discretion by admitting the imprints after ruling the State had demonstrated they were in significantly the same condition.**

█ Detective Thompson testified that he investigated the crime scene from approximately 7:00 a.m. until about 9:15 a.m. on the morning of the assaults, and photographed some shoe and tire imprints outside the victims' home. That evening, at around 9:20 p.m., Detective Thompson returned to the crime scene and took castings of the tire and shoe imprints for comparison to the tires on Bush's car and the shoes he was wearing when he was arrested. Contrary to Bush's argument that there was no testimony that the imprints were in the same condition when Thompson made the castings as when he first observed them earlier in the morning, Detective Thompson specifically testified that he took castings of the same shoe and tire imprints he had seen that morning, that the imprints were in the same condition as they had been that morning and that they had not been disturbed in any way. Although Thompson did testify that the crime scene was not under constant guard from early in the morning until he returned that evening, the only requirement is that the evidence be in "substantially the same condition" as when the crime was committed. *State v. Griffith*, 94 Idaho 76, 81, 481 P.2d 34, 39 (1971). In *Griffith*, the Court explained:

> "It is not necessary that an object which is offered in evidence should be in precisely the same condition at the moment of its offer as at the time when it played a part in the occurrence which gave rise to its offer in evidence. But, the change in its condition must not have been wrought for unjustifiable purposes, and it must not be of sufficient moment so that the exhibit will mislead."

*Id.* at 81, 481 P.2d at 39 (quoting *State v. Hood*, 225 Or. 40, 356 P.2d 1100, 1103 (1960)).

This Court then held that if the lower court is satisfied that in "all reasonable probability the article has not been changed in any important respect," it is admissible into evidence. *Id.* at 82, 481 P.2d at 40. Thus, by admitting the tire and shoe imprint castings into evidence, the district court must have been satisfied by Detective Thompson's testimony that the evidence had not changed in any material aspect. The district court properly exercised its discretion under the three-part *Hedger* test in admitting the evidence.

**G. The District Court Did Not Impose Illegal or Excessive Sentences.**

**1. Infamous crime against nature sentence.**

█ Bush was sentenced to fifty-five years with twenty-five years fixed for the conviction for an infamous crime against nature pursuant to I.C. § 18–6605. That section provides that "[e]very person who is guilty of the infamous crime against nature . . . is punishable by imprisonment in the state prison not less than five years." I.C. § 18–6605. Bush argues that his sentence for this crime is illegal because, since I.C. § 18–6605 provides no sentencing limits, the sentencing court has unfettered discretion in violation of the Due Process Clauses of the United States and Idaho Constitutions. This argument is without merit.

In *In re Miller*, 23 Idaho 403, 129 P. 1075 (1913), this Court first addressed the maximum sentence for the infamous crime against nature. In that case, the defendant argued that because the statute (then codified as Section 6810, Rev.Stats. of 1887) did not set forth a maximum sentence, the maximum should be five years pursuant to Section 6312, Rev.Stats. (now I.C. § 18–112), which provided for a five-year maximum sentence for felonies, except where a different punishment was provided. The Court disagreed, holding that the legislature could not have intended the minimum and maximum sentences to be the same. Thus, the Court held that the maximum sentence for an infamous crime against nature conviction is left to the

discretion of the sentencing court, except that the death penalty may not be imposed. *Id.* at 408, 129 P. at 1076. The issue arose again in *State v. Carringer,* 95 Idaho 929, 523 P.2d 532 (1974), in which this Court interpreted *In re Miller, supra,* as holding that I.C. § 18–6605 provides for both a maximum and a minimum sentence and that the maximum sentence is established by the discretion of the trial court. 95 Idaho at 931, 523 P.2d at 534. The Court in *Carringer* also specifically stated that it declined to overrule *Miller. See also State v. Brashier,* 127 Idaho 730, 737, 905 P.2d 1039, 1046 (Ct.App.1995) ("[T]he maximum sentence for the infamous crime against nature is left to the discretion of the trial court, and may extend to life imprisonment.")

Based upon the foregoing, we conclude that the district court, in its discretion, could have sentenced Bush to anything less than death, including life imprisonment. Therefore, we hold that the sentence of fifty-five years, with twenty-five years fixed, is not illegal.

2. **Forcible sexual penetration by use of a foreign object and lewd conduct with a minor sentences.**

██ For the forcible penetration by use of a foreign object conviction, Bush received a forty-five year sentence with twenty-five years fixed. For the lewd conduct with a minor conviction, Bush received a fixed life sentence without the possibility of parole. The only argument Bush raises with respect to these two sentences is that they are not supported by any facts or reasoning, and that they are both based on public outcry and not on the sentencing criteria in Idaho.

██ To prevail on appeal, Bush must establish that the sentencing court clearly abused its discretion. *State v. Shiloff,* 125 Idaho 104, 106, 867 P.2d 978, 980 (1994). Reasonableness is a fundamental requirement in the exercise of discretion. *State v. Charboneau,* 124 Idaho 497, 499, 861 P.2d 67, 69 (1993). The reasonableness of a sentence is determined by looking at the probable length of confinement. *State v. Wersland,* 125 Idaho 499, 503, 873 P.2d 144, 148 (1994). A period of confinement is reasonable if it appears necessary to accomplish the primary sentencing objective of protecting society and to achieve any or all of the related goals of deterrence, rehabilitation or retribution applicable to a given case. *Id.* at 502–03, 873 P.2d at 147–48. In determining whether the period of confinement appears necessary to accomplish these objectives, the appellate court conducts an independent review of the record, focusing on the nature of the offense, the character of the offender, and protection of the public interest. *Shiloff,* 125 Idaho at 106, 867 P.2d at 980. A clear abuse of discretion is shown only if Bush establishes that, considering the sentencing objectives, the sentences imposed are excessive under any reasonable view of the facts. *Wersland,* 125 Idaho at 503, 873 P.2d at 148.

In *State v. Lewis,* 123 Idaho 336, 848 P.2d 394 (1993), this Court affirmed a fixed life sentence in a case factually similar to the present one. In *Lewis,* the defendant was convicted of the crime of lewd conduct with a minor under the age of sixteen, in violation of I.C. § 18–1508. Specifically, Lewis was convicted of performing oral sex and attempting to perform anal sex upon a fifteen-year-old boy. The Court held that the district court did not abuse its discretion in sentencing Lewis to a fixed life term and that the sentence was reasonable under the facts of the case. *Id.* at 352, 848 P.2d at 410. The Court noted that the record revealed that Lewis had previously been convicted for a sexual offense against a minor in 1979 in Tennessee; that Lewis was HIV-positive at the time the crime was committed; that there were several allegations of uncharged sexual misconduct between Lewis and minors during the sentencing proceedings; and that Lewis continued to deny that he committed the crime. *Id.*

In the present case, Bush has failed to establish that the district court abused its discretion in imposing concurrent sentences that result in fixed life. The sentence imposed by the district court was reasonable in

view of Bush's character, prior criminal record and the nature of the offenses. Bush was convicted of committing three violent sexual assaults against a fifteen-year-old boy and his mother. Furthermore, Bush broke into the victims' home at night, beat them with his fists and threatened to kill them both.

In addition to the nature of the offenses, the district court reviewed a thorough presentence report that detailed Bush's extensive prior criminal history that began in 1969 when he was a minor. In 1970, Bush was convicted of five misdemeanors: assault, petit larceny, minor in possession, disturbing the peace and failure to obey a citation. In 1972, Bush was convicted of his first felony, delivery of a controlled substance. Between 1979 and 1993, Bush was convicted of multiple driving offenses, possession of a controlled substance, domestic battery and battery.

In January 1993, Bush was convicted of his first sexual offense and second felony, immoral acts with a child in Wyoming. The Wyoming presentence report revealed that he had forced a sixteen-year-old female to have oral-genital contact with him and fondled her vagina. Bush served eighteen months of a five to ten-year sentence and was then placed in the Community Alternatives Center in Casper, Wyoming. He was released to attend his mother's funeral, and committed these crimes during that release.

At the sentencing hearing, the district court stated that it believed the jury verdict was based on substantial and competent evidence and that Bush invaded the sanctity of the home and invaded the bodies of J.S. and B.S. sexually. With respect to the physical assault, the court noted that the beating of J.S. was especially severe in that he received a broken nose, an eye injury and numerous cuts and abrasions. The court also discussed the sentencing objectives and concluded that Bush had failed to take advantage of rehabilitation opportunities he had been given in the past, and that it did not believe Bush could be rehabilitated. The court stated that it believed that Bush posed a risk to society

and especially to young children, and that Bush was, in fact, a predator.

Under the circumstances of this case, we conclude that reasonable minds could differ as to whether concurrent fixed life sentences are appropriate. Accordingly, we hold that the district court did not abuse its discretion in sentencing Bush to a fixed life term.

## IV.

## CONCLUSION

Based upon the foregoing, the judgment of conviction and sentences imposed on Bush are affirmed.

TROUT, C.J., and JOHNSON, SCHROEDER and WALTERS, JJ., concur.