127 P.3d 212

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Jeremy Flores SANCHEZ, Defendant–Appellant.**

No. 30202.

Court of Appeals of Idaho.

Oct. 6, 2005.

312

Nevin, Benjamin McKay, Boise, for appellant. Dennis A. Benjamin argued.

Hon. Lawrence G. Wasden, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for respondent. Kenneth K. Jorgensen argued.

PERRY, Chief Judge.

Jeremy Flores Sanchez appeals from his judgments of conviction and sentences for conspiracy to commit robbery, robbery, conspiracy to commit first degree kidnapping, first degree kidnapping, aggravated battery, and attempted first degree murder. We affirm.

## I.

### FACTS AND PROCEDURE

In June 2000, the victim in this case was traveling eastbound on an interstate through Idaho. While driving in the right lane, the victim noticed a dark-colored, four-door vehicle with four people driving along side her in the left lane. When the victim increased her speed, the other vehicle also increased its speed. A man and a woman seated on the passenger side of the vehicle leaned out through their windows and begin to strike the victim's car with sticks. The victim stopped her car and tried to get around the vehicle. The driver of the other vehicle then parked across both eastbound lanes. Three of the vehicle's occupants, two men and a woman, approached the victim's car and demanded money and drugs. A tall man, later identified as John Wurdemann, placed the victim in the passenger seat of her car and then sat in the driver's seat. The woman, later identified as Sarah Pearce, entered the victim's car and sat behind John. The other man, later identified as Sanchez, sat directly behind the victim.

A man, later identified as Kenneth Wurdemann, approached in the assailants' vehicle and yelled, "Get her car off the road." Kenneth proceeded down the interstate while John followed in the victim's car. The vehicle and the victim's car exited the freeway and parked along a dark country road in a field. The victim pleaded with her assailants not to harm her. John responded by stabbing the victim five times in the chest. John continued to demand money, and the victim

provided her wallet, which contained $40 and credit cards. John attempted to slash the victim's throat but instead cut her hand and took her wedding ring. The victim then turned to Pearce, who was sitting in the back seat, and pleaded for her life. Sanchez grabbed the victim's hair, pulled it back, reached over the victim's right side and cut her throat.

The victim told Pearce to take all of her possessions but to please not kill her. Pearce responded by telling the victim that she and her associates would take everything and then kill her. The victim exited her car and kneeled on the ground to plead for her life. Kenneth approached the victim's car and stated, "We're going to kill her now." Sanchez and Pearce exited the victim's car, and Kenneth struck the victim in the head from behind with a baseball bat. The victim fell to the ground face first and Sanchez, Pearce, and John repeatedly stabbed and beat the victim's back. The assailants took $500 from the trunk of the victim's car and several collectible dolls. The assailants then left the victim lying on the ground and drove away in their vehicle.

While driving away from where they had left the victim, the assailants decided to return because things needed to be "taken care of right." Upon their arrival, John slashed the victim's shoulder with a knife. The victim fell to the ground face first with her feet lying partially under her car. The assailants then set the victim's car on fire and departed. The victim was able to roll away from her burning car and was rescued after the fire drew the attention of passersby. The victim was taken to the hospital and treated in the intensive care unit. After ten days in the hospital, the victim was released to a hospital closer to her home, where she remained for another six days.

Law enforcement obtained details of the attack and descriptions of the suspects from the victim, which were broadcast on the news. In response to a news story, a witness reported that she had been driving on a highway near the location the victim was found a few hours before the incident. The witness testified that four people in a mid-sized four-door maroon vehicle had flagged down her vehicle under suspicious circumstances. The witness identified Sanchez and the Wurdemanns from a video lineup as the men who had stopped her vehicle. Another witness reported that, shortly before the victim was abducted, he stopped at a rest stop just west of the location of the attack. The witness indicated that he saw three men and a woman in a gold four-door vehicle. Two men and a woman entered the restrooms while the third man waited at the vehicle. In the men's restroom and in the lobby, the witness was able to see the two men at close range, in a well-lit area. From a video lineup, the witness identified Sanchez and John as being present at the rest stop. Both witnesses identified Sanchez in court as being the person that they had seen on the night in question.

Over the course of the investigation, the victim was shown photo and video lineups. In one photo lineup, the victim was shown photographs of six men, including Sanchez. From these photographs, the victim selected a man other than Sanchez and indicated that the man in the picture jumped out at her as being the perpetrator. The victim later testified that she picked the man instead of Sanchez because Sanchez's skin tone appeared too pale in the photograph. In another photo lineup, the victim identified a woman other than Pearce and told the officer that she was certain the woman was the perpetrator. Later, the victim was told that the person she identified was not a suspect. The victim testified that she viewed that lineup shortly after watching a re-enactment of the attack on *America's Most Wanted.* The victim testified that she picked the photo of the woman who was not Pearce because that woman looked similar to the actress in the re-enactment. In two other photo lineups, the victim was shown two sets of six photographs, including one with John and another with Pearce. The victim identified neither John nor Pearce from those lineups.

The victim informed law enforcement that she was not comfortable with her attempts to identify her assailants from photographs because she was not able to observe body language or hear voices. In March 2002, law enforcement showed the victim four sets of

video lineups, from which she identified Sanchez, Pearce, and the Wurdemanns as being the perpetrators of the attack against her. The victim testified that she felt more confident about her ability to correctly identify her assailants in the video. In court, the victim identified Sanchez as the man who sat behind her in her car and cut her throat.

In March 2002, Sanchez was arrested and charged with conspiracy to commit robbery, I.C. §§ 18–1701, 18–6501; robbery, I.C. §§ 18–204, 18–6501, 18–6502, 18–6503; conspiracy to commit first degree kidnapping, I.C. §§ 18–1701, 18–4501; first degree kidnapping, I.C. §§ 18–204, 18–4501, 18–4502; aggravated battery, I.C. §§ 18–903(a), 18–907(b); first degree arson, I.C. §§ 18–204, 18–802; and attempted first degree murder, I.C. §§ 18–204, 18–306, 18–4001, 18–4002, 18–4003. A trial was held in October and November 2002. The jury was unable to reach a unanimous verdict, and the district court declared a mistrial.

A second trial was held in May and June 2003. Kenneth testified for the state in exchange for the state's agreement to dismiss several charges pending against him and to limit its sentencing recommendation to a unified term of ten years. Kenneth testified that he had been in a bar on the night in question, where he observed Sanchez, John, and a woman. Kenneth asked his brother John for a ride home, entered a vehicle with John, Sanchez and the woman, and fell asleep. Kenneth testified that he awoke at a rest stop and that Sanchez, John and the woman entered the restrooms while he waited at the vehicle. Kenneth indicated that they left the rest stop, continued down the freeway, and he fell asleep again. Kenneth awoke to find the vehicle and the victim's car stopped along the freeway and his companions outside of the vehicle. Kenneth then drove the vehicle while the others followed with the victim in her car. Kenneth exited the freeway and parked off a dark country road in a field. Kenneth testified that he hit the victim with a baseball bat out of fear of repercussion from his companions if he refused to participate. Kenneth also testified that, after leaving the scene, Sanchez and John decided to return. Kenneth testified he

observed that the victim's car was set on fire but did not see who started it.

The district court granted Sanchez's motion for acquittal on the first degree arson charge. A jury found Sanchez guilty of all other charges. Sanchez filed a motion to dismiss, which the district court denied. The district court sentenced Sanchez to consecutive determinate terms of life for conspiracy to commit robbery, robbery, conspiracy to commit first degree kidnapping and first degree kidnapping. The district court also sentenced Sanchez to consecutive determinate terms of fifteen years for aggravated battery and attempted first degree murder. Sanchez appeals.

## II.

## ANALYSIS

Sanchez contends that he was deprived of his right to a fair trial when the prosecutor elicited references to the victim's and Kenneth's religious affiliations. Sanchez alleges that the reasonable doubt jury instruction used in his trial violated his right to have the charges against him proved beyond a reasonable doubt. Sanchez also asserts that the district court erred by failing to sua sponte instruct the jury regarding eyewitness identifications. Sanchez contends that the district court erred in denying his motion to dismiss because his right to due process was violated when the state presented Kenneth as a credible witness at Sanchez's trial but impeached Kenneth's credibility at Pearce's trial. Sanchez also asserts that his sentences are excessive.

### A. Victim's and Kenneth's Religious Affiliations

■ Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that, by reason of the nature of those beliefs or opinions, the credibility of the witness is impaired or enhanced. I.R.E. 610. Although the impeachment of witnesses based upon their religious beliefs is prohibited, inquiry into religious beliefs for purposes such as showing interest or bias because of those beliefs is not

within the prohibition. *United States v. Teicher*, 987 F.2d 112, 118 (2d Cir.1993).[1]

Appeals to racial or religious prejudices are incompatible with the concept of a fair trial because of the likelihood that such references will sweep jurors beyond a fair and calm consideration of the evidence. *Commonwealth v. Johnson*, 431 Mass. 535, 728 N.E.2d 281, 286 (2000); *Commonwealth v. Stivala*, 435 Pa.Super. 176, 645 A.2d 257, 267 (1994). Reference to race or religious beliefs, when made principally to inflame jurors, constitutes prosecutorial misconduct. *See Commonwealth v. Adams*, 434 Mass. 805, 753 N.E.2d 105, 114 (2001). However, a witnesss beliefs or affiliation with a religious group is properly admissible where probative of an issue in a criminal prosecution. *United States v. Beasley*, 72 F.3d 1518, 1527 (11th Cir.1996). In *Beasley*, testimony regarding religious beliefs provided background to the crimes at issue and was not unduly prejudicial.

Sanchez contends that the prosecutor made repeated references to the religious beliefs of the victim and Kenneth. Sanchez asserts that, because the references were made to bolster the credibility of those witnesses, Rule 610 was violated. Sanchez also alleges that the prosecutor's references to religion pervaded the trial and were made as an attempt to appeal to the sympathies of jurors who were members of the same religion. Sanchez argues that the prosecutor's course of misconduct rose to the level of fundamental error and deprived him of his right to a fair trial.

### 1. References to religion

A toxicology screen of the victim's blood, which was conducted following the attack, demonstrated the presence of marijuana. During the investigation, the victim initially denied that she had smoked marijuana. Later, the victim admitted that she had possessed fourteen grams of marijuana and had smoked two joints prior to being attacked. At trial, the prosecutor questioned the victim regarding her marijuana use on direct examination. The victim testified that she began smoking marijuana about six years prior to the attack, that her husband did not know she was still using marijuana, and that she had promised him that she would stop smoking. The following exchange then occurred:

[Prosecutor]: And why was [the promise to your husband] important?

[Victim]: Well, it was important because I'm supposed to keep my promises to him, and it was also against my church rules.

[Prosecutor]: Which is which church?

[Victim]: The Church of Jesus Christ of Latter Day Saints.

[Prosecutor]: Which rules is that against?

[Victim]: The word of wisdom.

[Prosecutor]: Which is what?

[Victim]: Which is no drugs, no alcohol, no tobacco, no caffeine.

[Prosecutor]: How long have you been a church member?

[Defense counsel]: Judge, I'm going to object. That's irrelevant.

[Court]: Sustained.

The victim then explained that smoking marijuana alleviated her symptoms of depression and anxiety.

The victim testified that, after John slashed her shoulder, she had fallen to the ground and realized that her car was on fire. The victim then rolled away from her car and made a pillow out of dirt. The prosecutor asked:

[Prosecutor]: So you made a pillow. And what happened then?

[Victim]: And I started singing to myself one of my church songs. And I was just totally surrounded by white light—

[Defense counsel]: I'm going to object to this, Judge. This is irrelevant at this point.

[Court]: I'll sustain the objection as to the last portion of the answer.

[Prosecutor]: So after you laid there, do you know how long you laid there?

[Victim]: No.

---

1. In *Teicher*, the Court addressed Federal Rule of Evidence 610, which is written in language that is nearly identical to that of Idaho Rule of Evidence 610.

[Prosecutor]: What was the next thing you remember?

[Victim]: Being held in my heavenly father's arms.

[Defense Counsel]: I'm going to object to that and ask that it be stricken.

[Court]: Sustained and ordered stricken.

The victim also testified that at the time of the attack she had temple garments in her trunk. The victim explained that temple garments are sacred garments, which are worn when a member of the Church of Jesus Christ of Latter Day Saints (LDS) visits the temple.

On cross-examination, Sanchez impeached the victim extensively regarding her initial failure to disclose her marijuana use, her recollection of the details of the attack, and her failure to identify Sanchez, Pearce, and the Wurdemanns out of photo lineups. On redirect examination, the prosecutor questioned the victim regarding the importance of her marriage and her desire to prevent her husband from knowing that she had been lying about her marijuana addiction. The prosecutor then asked:

[Prosecutor]: Were there other implications as well for you?

[Victim]: Yes. It was against my religion.

[Prosecutor]: So what does that mean?

[Defense counsel]: Judge, I'm going to object. I mean, this is irrelevant.

[Court]: Overruled.

[Victim]: When you go to the temple you make covenants and promises to obey laws of the land and of God, and I had broken both.

[Prosecutor]: So [were] there any repercussions with regards to your church affiliation?

[Victim]: I went through a year repentance process.

[Prosecutor]: Was that another reason why you lied to the sheriff?

[Victim]: No. It was mainly about my husband.

During direct examination of Kenneth, he testified that he became acquainted with Idaho when he was called to serve a mission for the LDS church. Kenneth indicated that he had spent the day of the attack drinking beer. The prosecutor asked:

[Prosecutor]: How does that jibe with your LDS belief?

[Kenneth]: It's totally against it.

[Prosecutor]: So were you a practicing LDS at the time?

[Kenneth]: No.

Kenneth then testified that he went to a bar where he encountered John, Sanchez, and a woman and that he continued to drink beer.[2]

The prosecutor later asked Kenneth what he found in the victim's trunk. Kenneth testified that he found the victim's temple garments, slammed the trunk closed, and "became beside myself, wondering what have I done, what have I got myself into here." Kenneth also testified that he had previously lied about his involvement in the attack because he had not wanted his family to know and he had been in denial. Kenneth explained that he eventually decided to come forward with the truth because he wanted to do the right thing.

On cross-examination, Sanchez impeached Kenneth at length regarding letters he had written to friends and family during the investigation. In these letters, Kenneth wrote that he was compelled to lie and indicate that he was involved in the attack in order to avoid a life sentence. Kenneth wrote that he did not know who Sanchez was but was

2. Sanchez does not argue that the erroneous admission of evidence constituted reversible error and, instead, contends that a course of prosecutorial misconduct deprived him of his right to a fair trial. Thus, we do not address whether the district court's individual evidentiary rulings were in error or whether any one exchange resulted in fundamental error. Nevertheless, we note that the foregoing excerpts from the victim's redirect examination and Kenneth's direct examination were not relevant to trial issues and,

thus, improper. Although the admission of that testimony was harmless in the instant case, we emphasize the importance of limiting references to religion to the extent necessary to provide context and background to relevant events. Additionally, we encourage instructing the jury that any evidence regarding religious beliefs or opinions is inadmissible for the purpose of either enhancing or impairing witness credibility by reason of those beliefs or opinions. *See* I.R.E. 610.

utilizing information provided to him during the investigation to create the story that the state wanted to hear. Sanchez emphasized portions of these letters that contained references to religion, including one where Kenneth wrote that he was scared to testify falsely "for fear of what kind of judgment I will receive from the Lord at last" and another where he wrote "this course of lying will always be very detrimental to my salvation." Sanchez asserted that the state offered Kenneth a deal halfway through Sanchez's first trial and that Kenneth was lying on the stand because he wanted to benefit from that deal. Sanchez also impeached Kenneth, asserting that in a prior proceeding Kenneth had testified Pearce was not the woman involved in the attack and that on other occasions Kenneth had stated he did not know whether Pearce was the woman involved. On redirect, the prosecutor asked Kenneth if he "feared the Lord's judgment now that you've testified today?" Sanchez objected, and the district court sustained the objection. Kenneth also testified that his attorney contacted the state at his request and that he had decided to testify prior to being offered the sentencing recommendation by the state.

During closing argument, the prosecutor indicated that the victim had smoked two joints, which "was against her religion, and it was against the law, and she did not want to admit that. But that was a habit she had had for six years. It was her way of combating her depression issues." The prosecutor also argued that, at the time Kenneth disclosed that he had seen temple garments in the victim's trunk, no one but the victim and Kenneth had known that the garments were there. The prosecutor asserted that Kenneth previously lied about his involvement in the attack because he did not want to admit his actions to his mother, his conduct was "way beyond his prior LDS calling, and he was ashamed, and he was in denial. He didn't want to tell them anything about it." The prosecutor then reiterated that Kenneth could not have known about the temple garments unless he had actually been at the scene of the attack and that seeing those garments had affected Kenneth adversely because he "knew what they meant" to the victim.

## 2. Fairness of trial

■■■■ Sanchez acknowledges that he failed to object to most of the questioning, testimony and argument that he now contends constituted prosecutorial misconduct and that many of his objections to other religious references were sustained by the district court. Ordinarily, this Court will not address an issue not preserved for appeal by an objection in the trial court. *State v. Rozajewski*, 130 Idaho 644, 645, 945 P.2d 1390, 1391 (Ct.App.1997). Further, this Court will not review a trial court's alleged error on appeal unless the record discloses an adverse ruling which forms the basis for the assignment of error. *State v. Barnett*, 133 Idaho 231, 235, 985 P.2d 111, 115 (1999). Where a defendant's objection is sustained, there is no ruling unfavorable to the defendant for this Court to review or reverse. *See State v. Olson*, 138 Idaho 438, 442, 64 P.3d 967, 971 (Ct.App.2003). The district court instructed the jury that, when an objection was sustained, the witness would not be allowed to answer and that the jury was prohibited from guessing what the witness might have said. The district court similarly indicated that, when it instructs the jury not to consider a particular statement, the jury was required to put that statement out of their minds and not refer to it or rely on it during later deliberations. Generally, we presume that the jury followed the district court's instructions. *See State v. Kilby*, 130 Idaho 747, 751, 947 P.2d 420, 424 (Ct.App.1997); *State v. Hudson*, 129 Idaho 478, 481, 927 P.2d 451, 454 (Ct.App.1996).

However, Sanchez does not contend that any individual section of testimony or argument, standing alone, deprived him of a fair trial. Rather, Sanchez argues that the prosecutor engaged in a pattern of misconduct by eliciting references to the victim and Kenneth's religious backgrounds. Sanchez asserts that, in order for the jury to find him guilty, the jurors had to believe that the victim's in-court identification of Sanchez was reliable. Sanchez urges that, therefore, the victim's credibility was central to the trial. Sanchez argues that, considered in this context, the prosecutor's attempts to improperly

**318**

bolster the credibility of its witnesses rose to the level of fundamental error and violated his right to due process. Under such circumstances, Sanchez contends that the unfair prejudice resulting from inappropriate references to religion could not be completely undone, even where the objection was sustained and a curative instruction given.

■■■ Prosecutorial misconduct may so infect the trial with unfairness as to make the resulting conviction a denial of due process. *Greer v. Miller,* 483 U.S. 756, 765, 107 S.Ct. 3102, 3109, 97 L.Ed.2d 618, 630 (1987). To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial. *Id.* The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.[3] *Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78, 87 (1982). The aim of due process is not the punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused. *Id.*

■■■ A criminal defendant's due process right to a fair trial is the basis for the doctrine of fundamental error. *See State v. Wright,* 115 Idaho 1043, 1048, 772 P.2d 250, 255 (Ct.App.1989); *State v. Kay,* 108 Idaho 661, 663, 701 P.2d 281, 283 (Ct.App.1985). Prosecutorial misconduct rises to the level of fundamental error when it is calculated to inflame the minds of jurors and arouse prejudice or passion against the defendant or is so inflammatory that the jurors may be influenced to determine guilt on factors outside the evidence. *State v. Porter,* 130 Idaho 772, 785, 948 P.2d 127, 140 (1997). Prosecutorial misconduct rises to the level of fundamental error only if the acts or comments constituting the misconduct are so egregious or inflammatory that any ensuing prejudice could not have been be remedied by a curative jury instruction. *State v. Smith,* 117 Idaho 891, 898, 792 P.2d 916, 923 (1990); *State v. Love-*

*lass,* 133 Idaho 160, 167, 983 P.2d 233, 240 (Ct.App.1999). The rationale of this rule is that even a timely objection to such inflammatory statements would not have cured the inherent prejudice. *State v. Brown,* 131 Idaho 61, 69, 951 P.2d 1288, 1296 (Ct.App.1998).

■■■ Our inquiry is, thus, two-tiered. We first determine whether the prosecutorial conduct complained of was improper. *State v. Reynolds,* 120 Idaho 445, 448, 816 P.2d 1002, 1005 (Ct.App.1991). If we conclude that it was, we then consider whether such misconduct prejudiced the defendant's right to a fair trial or whether it was harmless. *Id.* Where the appellate court is able to declare that, beyond a reasonable doubt, the jury below would have reached the same result had the misconduct not occurred, the error is deemed harmless. *Id.* at 451, 816 P.2d at 1008.

The record does not support Sanchez's contention that references to religion were so inflammatory that the jurors may have been influenced to determine guilt on factors outside the evidence. In support of his position, Sanchez relies on cases involving misconduct, which either attempted to bring the defendant's credibility into question or bolster that of a witness. *See Commonwealth v. Mahdi,* 388 Mass. 679, 448 N.E.2d 704, 712 (1983); *People v. Hall,* 391 Mich. 175, 180–81, 215 N.W.2d 166, 169–70 (1974); *People v. Wells,* 82 Mich.App. 543, 267 N.W.2d 448, 449 (1978); *People v. Benedetto,* 294 A.D.2d 958, 744 N.Y.S.2d 92, 94 (N.Y.App.Div.2002). However, the religious references in those cases did not serve a legitimate purpose at trial other than to equate religious beliefs with credibility.

In contrast, most of the references in the instant matter were relevant to issues at trial. Further, the prosecutor never argued that either the victim or Kenneth should be believed because of their religious affiliations. In regard to the victim's testimony, the state did not elicit comments regarding religion in attempt to demonstrate that, because of the

---

**3.** Sanchez argues that the closing argument and testimony elicited by the prosecutor in the first trial support his contention that prosecutorial misconduct in the second trial deprived him of his right to a fair trial. Because any misconduct

in the first trial could have had no impact on the jury in the second trial and the culpability of the prosecutor is irrelevant, we do not consider these arguments.

nature of the victim's beliefs, the jury should consider her credible. Rather, the victim's religious background was used to provide context to her initial dishonesty about her marijuana use.

Sanchez alleged that Kenneth was lying at Sanchez's second trial to secure a favorable sentencing recommendation and that Kenneth's initial denials that he had been involved in the attack had been the truth. Testimony regarding the victim's and Kenneth's religious backgrounds established the presence of temple garments in the trunk and the reason that Kenneth recognized those garments. The prosecutor presented evidence that Kenneth reported seeing the victim's temple garments before it was possible that he could have found out about their presence from another source in order to rebut Sanchez's contention that Kenneth was lying about Sanchez's involvement in the attack.

Further, during cross-examination of Kenneth, Sanchez highlighted assertions pertaining to Kenneth's religious beliefs, which were written in Kenneth's letters to friends and family. Sanchez emphasized that Kenneth feared for his salvation to support his position that Kenneth had been telling the truth in his letters and was lying on the stand. Thus, Kenneth's re-direct testimony about religion was not elicited in attempt to appeal to juror sympathies, but rather to rehabilitate Kenneth and explain that Kenneth's religious background contributed to his initial denial of his involvement in the attack. We are also not persuaded by Sanchez's attempt to tie the victim's credibility to the reliability of her in-court identification. The facts surrounding the victim's attack were not in dispute, and Sanchez never contended that the victim was lying when she identified Sanchez as a perpetrator. Thus, whether the state could prove that Sanchez was one of the victim's assailants beyond a reasonable doubt was not directly related to the victim's character for truthfulness.

The references to the victim's and Kenneth's religious affiliations were not offered to enhance their credibility by reason of their religious beliefs but, instead, were relevant to legitimate issues at trial. Further, the references to religion were neither calculated to inflame the minds of jurors and arouse prejudice nor were they unduly inflammatory. Therefore, regardless of whether the prosecutor's conduct was improper, the references to religion at Sanchez's trial were not sufficiently egregious to rise to the level of fundamental error.

**B. Reasonable Doubt Jury Instruction**

 Sanchez contends that the district court committed reversible error by using a jury instruction with a definition of reasonable doubt that was misleading. The question whether the jury has been properly instructed is a question of law over which we exercise free review. *State v. Gleason*, 123 Idaho 62, 65, 844 P.2d 691, 694 (1992). When reviewing jury instructions, we ask whether the instructions as a whole, and not individually, fairly and accurately reflect applicable law. *State v. Bowman*, 124 Idaho 936, 942, 866 P.2d 193, 199 (Ct.App.1993). Reversible error will be found if the court uses an instruction that misstates the law or misleads the jury. *State v. Dudley*, 137 Idaho 888, 890, 55 P.3d 881, 883 (Ct.App.2002); *State v. Colwell*, 124 Idaho 560, 564, 861 P.2d 1225, 1229 (Ct.App.1993).

Here, the district court defined reasonable doubt in the jury instructions as follows:

It is not merely possible doubt, because everything relating to human affairs is open to some possible or imaginary doubt. It is the state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.

Sanchez argues that this definition's use of the plural terms "the jurors" and "they" rather than the singular "the juror" and "he or she" was in error because it told jurors that Sanchez's guilt should be determined based upon a collective determination as to the reasonableness of any doubt rather than a determination made individually by each juror. According to Sanchez, the jurors could have interpreted the instruction to mean that each juror must decide whether the jury as a whole has found reasonable

doubt, rather than requiring that each juror arrive at his or her own independent conclusion as to whether the state has proved the charges beyond a reasonable doubt. This, he asserts, could have led a juror to assess the reasonableness of his or her doubt based solely upon whether the doubt was shared by other jurors.

This Court recently rejected Sanchez's argument. *See State v. Williams,* 141 Idaho 826, 118 P.3d 158 (Ct.App.2005). As in *Williams,* the instruction at issue here was based almost entirely on Idaho Criminal Jury Instruction (ICJI) 103, which was approved by the Idaho Supreme Court for use in Idaho criminal trials.[4] This instruction does not convey that jurors should subordinate their own views of the sufficiency of the evidence to the collective evaluation of the other jurors. *Williams,* 141 Idaho at 828, 118 P.3d at 160.

Further, even if such a misinterpretation could arise, another instruction given to the jury would have corrected any such misperception. That additional instruction told the jury:

> During your deliberations, you each have a right to re-examine your own views and change your opinion. You should only do so if you are convinced by fair and honest discussion that your original opinion was incorrect based upon the evidence the jury saw and heard during the trial and the law as given you in these instructions.

> Consult with one another. Consider each other's views, and deliberate with the objective of reaching an agreement, if you can do so without disturbing your individual judgment. Each of you must decide this case for yourself; but you should do so only after a discussion and consideration of the case with your fellow jurors.

> However, none of you should surrender your honest opinion as to the weight or effect of evidence or as to the innocence or guilt of the defendant because the majority of the jury feels otherwise or for the purpose of returning a unanimous verdict.

Our inquiry on appeal is whether the jury instructions, as a whole, fairly and accurately state the applicable law. *State v. Keaveny,* 136 Idaho 31, 33, 28 P.3d 372, 374 (2001); *Bowman,* 124 Idaho at 942, 866 P.2d at 199. The two instructions together made it clear that the jurors were to make their findings as to guilt individually, not based on a collective view, and were to change their opinions only when clearly convinced that the evidence supported the change of stance. The district court's instructions to the jury were a correct and acceptable statement of the law and were not misleading.

**C. Eyewitness Identification Jury Instruction**

Sanchez asserts that the eyewitness identification procedures that were used to identify the victim's assailants, in combination with the other circumstances surrounding the attack, presented a significant risk of misidentification. Sanchez argues that, therefore, the jury should have been instructed on the risks inherent in eyewitness identifications. However, Sanchez requested no such instruction during trial and contends that the district court should have instructed the jury sua sponte.

A defendant is entitled to an instruction where there is a reasonable view of the evidence presented in the case that would support the theory. *State v. Eastman,* 122 Idaho 87, 90, 831 P.2d 555, 558 (1992). Nonetheless, the trial court is not obligated to determine what theories to instruct the jury on. *Id.* at 91, 831 P.2d at 559. Rather, it is incumbent upon the defendant to submit a requested instruction or in some other manner apprise the district court of the specific instructions requested. *Id.* at 90, 831 P.2d at 558. Accordingly, a defendant may not challenge on appeal the failure to give a jury instruction that was never requested, absent fundamental error. *State v. Gomez,* 126 Idaho 83, 85, 878 P.2d 782, 784 (1994).

Sanchez asserts that the out-of-court identification procedures used to identify him as one of the victim's assailants were

---

**4.** The district court's instruction omitted the phrases "depending on moral evidence" and "to

a moral certainty" which are included in ICJI 103.

likely to result in misidentification and, thus, the victim's in-court identification of Sanchez was inherently unreliable. Sanchez argues that, therefore, the district court's failure to instruct the jury regarding eyewitness identification sua sponte violated his right to due process and constituted fundamental error. The defendant's right to due process is implicated when an in-court identification is tainted by an out-of-court identification that is so suggestive that there is a very substantial likelihood of misidentification. *See State v. Bush*, 131 Idaho 22, 28, 951 P.2d 1249, 1255 (1997). So long as the identification possesses sufficient aspects of reliability, there is not a substantial likelihood of misidentification. *Id.* To determine the reliability of a suggestive identification, we evaluate the totality of the circumstances through consideration of five factors: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of his or her prior description of the criminal; (4) the level of certainty demonstrated at the identification; and (5) the length of time between the crime and the identification. *Id.*

Sanchez asserts that the victim did not select him or the other assailants from photo lineups and, instead, identified them during video lineups conducted nearly two years after the attack. Sanchez alleges that, after the victim failed to select Sanchez from a photo lineup and indicated that another man was the perpetrator, Sanchez was placed in a video lineup. Sanchez contends that the state's utilization of him in the video lineup was improper because the state did not also use the man who the victim selected from the photo lineup. Sanchez asserts that, because he was the only person present in both the photo and video lineups, the procedure unduly emphasized him and led to his erroneous identification. Sanchez also asserts that the procedures were unreliable because the victim had smoked marijuana, the victim was under stress, the identification of Sanchez was cross-racial, a significant amount of time had lapsed between the crimes and the identifications, and the victim had no prior contact with Sanchez. Sanchez also notes that it was disputed whether the victim was wearing her glasses during the attack and that she

admitted to misidentifying a woman after viewing a re-enactment of the offense. Sanchez asserts that the victim indicated that the man who attacked her was several inches shorter than Sanchez. Sanchez contends that the totality of these circumstances establishes that the out-of-court identification procedures were inherently unreliable and that there was a substantial likelihood of misidentification.

The reliability of eyewitness identification procedures was at issue in this case. However, we will consider the totality of the circumstances to determine whether there were sufficient aspects of reliability, which countered suggestive identification procedures. The victim testified that, while the assailants were driving her car, she attempted to study them because she knew it would be important to identify them. The victim testified that she was able to see the faces of her assailants because the dome light was on in her car. Aside from minor details, the victim's physical descriptions of the assailants remained consistent. The victim testified that she felt uncomfortable with the photo lineups because she could not hear the individuals' voices, watch their movements, or observe their body language. The victim testified that watching the video lineups facilitated her ability to assess whether the persons viewed were involved in the attack. Regarding a photo lineup, the victim testified that she selected a man other than Sanchez because that man had darker skin than Sanchez in the photo. The victim testified that during the attack the assailants all seemed tan and that the man selected in the photo lineup had a similar nose, mouth, and hairline to Sanchez.

Further, the victim's in-court identification of Sanchez was corroborated by two witnesses who identified Sanchez in court as being present with people fitting the descriptions of the assailants in the area of the attack on the night in question. These witnesses also selected Sanchez from the video lineup and testified that viewing the video lineups was very helpful in making identifications because of the opportunity to hear voices and observe body language. Sanchez also extensively cross-examined the state's

witnesses regarding the photo and video line-up procedures and made the jury aware of the potential problems that existed with those procedures.

■ There was sufficient evidence to put the reliability of the identification procedures at issue and, thus, had Sanchez requested an eyewitness identification jury instruction, the district court would not have erred by granting his request.[5] Nevertheless, we conclude that Sanchez's identification possessed sufficient aspects of reliability that there was not a substantial likelihood of misidentification. Therefore, the absence of a jury instruction regarding eyewitness identification did not deprive Sanchez of a fair trial and Sanchez may not challenge on appeal the failure to give an instruction that he failed to request.

## D. Motion to Dismiss

■ Sanchez argues that the district court erred in denying his motion to dismiss because his right to due process was violated when the state took inconsistent positions in different trials. Where defendants charged with the same crime are tried separately, the prosecutor's pursuit of fundamentally inconsistent theories can violate due process if the prosecutor knowingly uses false evidence or acts in bad faith. *Nguyen v. Lindsey*, 232 F.3d 1236, 1240 (9th Cir.2000). The government's fundamental interest in criminal prosecutions is not to win a case, but see that justice shall be done. *Smith v. Groose*, 205 F.3d 1045, 1049 (8th Cir.2000). Thus, the Due Process Clause places standards of conduct on the prosecutor that are not required of other participants in the criminal justice system. *Id.* Where the prosecution uses totally inconsistent theories of the same crime, trials are reduced to mere gamesmanship and are robbed of their search for the truth. *Id.* at 1050. However, to violate due process, an inconsistency must exist at the core of the

prosecutor's cases against defendants accused of the same crime. *Id.* at 1052.

*Smith* involved a series of cases where the question of timing was crucial. The prosecution attempted to convict as many codefendants as possible by arguing that the crime occurred at different times in separate trials. The court concluded that the prosecution's manipulation of the evidence deprived the defendant of due process and rendered his trial fundamentally unfair. In contrast, *Nguyen* involved codefendants who were involved in a gun battle when an innocent bystander was killed. The prosecutor made different arguments at each codefendant's trial regarding who fired the first shot. However, the prosecution's underlying theory of the case at both trials was that, when a shot kills a third person in a voluntary gun battle, all who voluntarily participate are responsible for the crime. The court noted that, because trial preparation is not a static process, it was not shocking or unusual that the evidence came out differently in the separate trials. *Id.* at 1240. Thus, the court held that the prosecution's theory was not inconsistent in any fundamental way and the defendant's right to due process was not violated.

■ Sanchez contends that it was fundamentally unfair for the state to present Kenneth as a credible witness at Sanchez's trial, while portraying him as a liar during Pearce's trial. In denying Sanchez's motion to dismiss, the district court found that the prosecution had not presented inconsistent theories, arguments, or testimony. We agree. At Pearce's trial, Kenneth testified for the defense. Pearce asked Kenneth, "When you look at [Pearce], was she the girl there?" Kenneth answered, "No." On cross-examination, the state impeached Kenneth extensively regarding past lies and highlighted that, prior to his testimony at Pearce's trial, Kenneth had consistently said that he

---

5. This Court has recognized that the use of expert testimony to assist the jury in assessing the accuracy of eyewitness identification can be appropriate and has cited to California's standard jury instructions. *See State v. Pacheco*, 134 Idaho 367, 371 n. 2, 2 P.3d 752, 756 n. 2 (Ct.App. 2000). The California Supreme Court indicated that, when requested, an eyewitness jury instruction should be given in a case where identifica-

tion is a crucial issue and there is no substantial corroborative evidence. *People v. Wright*, 45 Cal.3d 1126, 248 Cal.Rptr. 600, 755 P.2d 1049, 1059 (1988). California's standard instructions provide that identification must be proven beyond a reasonable doubt and list factors that the jury should consider in determining the reliability of eyewitness identification. *See* CALJIC 2.91–2.92 (2005).

did not know whether Pearce was the woman who participated in the attack. At Sanchez's trial, the state also presented facts demonstrating that Kenneth had previously lied, but argued that his testimony regarding Sanchez's involvement was true.

As noted by the district court, the situation presented in the instant case is distinguishable from a situation where the state presented separate and irreconcilable theories of guilt. In both trials, the state's position regarding the assailants' respective roles in the attack remained the same. The state also consistently alleged that Kenneth had been lying when he had denied his involvement in the attack, that he was telling the truth regarding that involvement at Sanchez's trial, and that Kenneth could not identify the woman who had participated in the attack. Accordingly, we conclude that Sanchez's right to due process was not violated, and the district court did not err in denying Sanchez's motion to dismiss.

### E. Excessive Sentences

An appellate review of a sentence is based on an abuse of discretion standard. *State v. Burdett*, 134 Idaho 271, 276, 1 P.3d 299, 304 (Ct.App.2000). Where a sentence is not illegal, the appellant has the burden to show that it is unreasonable, and thus a clear abuse of discretion. *State v. Brown*, 121 Idaho 385, 393, 825 P.2d 482, 490 (1992). A sentence may represent such an abuse of discretion if it is shown to be unreasonable upon the facts of the case. *State v. Nice*, 103 Idaho 89, 90, 645 P.2d 323, 324 (1982). A sentence of confinement is reasonable if it appears at the time of sentencing that confinement is necessary "to accomplish the primary objective of protecting society and to achieve any or all of the related goals of deterrence, rehabilitation or retribution applicable to a given case." *State v. Toohill*, 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct. App.1982). Where an appellant contends that the sentencing court imposed an excessively harsh sentence, we conduct an independent review of the record, having regard for the nature of the offense, the character of the offender and the protection of the public interest. *State v. Reinke*, 103 Idaho 771, 772, 653 P.2d 1183, 1184 (Ct.App.1982).

Sanchez argues that the district court abused its discretion because the goals of sentencing could have been met without imposing determinate life terms. Sanchez contends that he has never been offered the benefit of any rehabilitative treatment and, thus, there was no evidence that he was not amenable to rehabilitation. Sanchez also alleges that his sentences are excessive because no one was killed and both Pearce and Kenneth received less severe sentences.

A determinate life sentence may be deemed reasonable if the offense is so egregious that it demands an exceptionally severe measure of retribution and deterrence or if the offender so utterly lacks rehabilitative potential that imprisonment until death is the only feasible means of protecting society. *State v. Eubank*, 114 Idaho 635, 638, 759 P.2d 926, 929 (Ct.App.1988). A determinate life term, with its rigid preclusion of parole or good time, should be regarded as a sentence requiring a high degree of certainty that the nature of the crime demands incarceration until the defendant's death or that the perpetrator could never be safely released. *Id.* In *Eubank*, the defendant was sentenced to a determinate life term for burglary, sexual abuse of a child, and being a persistent violator. This Court concluded that the defendant's crimes were not so egregious as to demand a determinate life term and that the record did not support the conclusion that the defendant could never be safely returned to society.

Here, as a result of the victim's physical injuries, she was no longer able to perform her past occupation and endured painful physical therapy. Further, the victim suffered from post-traumatic stress disorder as a result of the attack and experienced anxiety, panic attacks, and nightmares. The victim reported that she had endured significant emotional damage, which had made it impossible for her to work at night or to travel alone. The victim's family reported that the attack fundamentally changed the victim and that repercussions from the attack continued to affect them. In imposing Sanchez's sentences, the district court found that San-

**324**

chez's crimes were callous, vicious and represented incomprehensible, senseless acts of violence. The district court noted that the random nature of such crimes gave the community the most cause for concern. The district court also found that Sanchez and his accomplices had acted as predators hunting a defenseless victim, which contributed to the enormity of the crimes. Thus, the district court concluded that significant sentences were required so as to not depreciate the seriousness of the offenses for others in the community.

In 1991, Sanchez was sentenced to a unified term of six years, with a minimum period of confinement of three years, for attempted second degree murder. The district court retained jurisdiction but, due to Sanchez's poor performance in the rider program, relinquished jurisdiction and imposed Sanchez's sentence. In 1995, Sanchez was placed on parole, which he violated by possessing a firearm. Sanchez's parole was revoked, and he remained in prison until 1998. While incarcerated, Sanchez received numerous disciplinary offense reports. The district court found that, based on Sanchez's criminal history and the nature of the instant offenses, Sanchez presented a significant and unacceptable risk to society.

We conclude that the crimes at issue in this case were so egregious that they demanded exceptionally severe measures of retribution and deterrence. Accordingly, the district court did not abuse its discretion by imposing determinate life terms for conspiracy to commit robbery, robbery, conspiracy to commit first degree kidnapping and first degree kidnapping. Further, having thoroughly reviewed the record in this case, we cannot say that Sanchez's sentences for aggravated battery and attempted first degree murder represented an abuse of the district court's discretion.

### III.

### CONCLUSION

The references during trial to the victim's and Kenneth's religious affiliations were not so egregious as to constitute fundamental error. The reasonable doubt jury instruction

did not deprive Sanchez of his right to have the charges against him proved beyond a reasonable doubt. Further, the district court's failure to sua sponte instruct the jury regarding inherent dangers of eyewitness identification did not result in fundamental error. The district court correctly determined that the state did not present conflicting theories at separate trials and, thus, Sanchez's right to due process was not violated. Finally, Sanchez's sentences do not represent an abuse of the district court's discretion. Accordingly, Sanchez's judgments of conviction and sentences for conspiracy to commit robbery, robbery, conspiracy to commit first degree kidnapping, first degree kidnapping, aggravated battery, and attempted first degree murder are affirmed.

Judge GUTIERREZ and Judge Pro Tem SCHWARTZMAN concur.

