**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 34874**

| | | |
|---|---|---|
| **STATE OF IDAHO,** | ) | **2009 Opinion No. 27** |
| | ) | |
| **Plaintiff-Respondent,** | ) | **Filed: April 10, 2009** |
| | ) | |
| v. | ) | **Stephen W. Kenyon, Clerk** |
| | ) | |
| **ETHAN ALLEN WINDOM,** | ) | |
| | ) | |
| **Defendant-Appellant.** | ) | |
| | ) | |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Cheri C. Copsey, District Judge.

Judgment of conviction and determinate sentence of life imprisonment, <u>affirmed</u>.

Molly J. Huskey, State Appellate Public Defender; Justin M. Curtis, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Jessica M. Lorello, Deputy Attorney General, Boise, for respondent.

_____

GUTIERREZ, Judge

Ethan Allen Windom appeals from his judgment of conviction and sentence for second degree murder. We affirm.

## I.

## BACKGROUND

At the age of sixteen, Ethan Allen Windom was indicted by a grand jury for first degree murder for the killing of his mother, Judy Windom. Pursuant to a plea agreement, he pled guilty to second degree murder, I.C. §§ 18-4001, 18-4002, 18-4003(g). The district court sentenced Windom to a determinate term of life imprisonment. Windom appeals, contending that the district court abused its discretion by imposing an excessive sentence. Specifically, Windom claims a determinate life sentence is excessive because he does not utterly lack rehabilitative potential and his crime is not so egregious that it demands such severe punishment.

1

## II.

## STANDARD OF REVIEW

An appellate review of a sentence is based on an abuse of discretion standard. *State v. Burdett*, 134 Idaho 271, 276, 1 P.3d 299, 304 (Ct. App. 2000). Where a sentence is not illegal, the appellant has the burden to show that it is unreasonable, and thus a clear abuse of discretion. *State v. Brown,* 121 Idaho 385, 393, 825 P.2d 482, 490 (1992). The objectives of sentencing, against which the reasonableness of a sentence is to be measured, are the protection of society, the deterrence of crime, the rehabilitation of the offender and punishment or retribution. *State v. Toohill*, 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct. App. 1982). In examining the reasonableness of a sentence, we conduct an independent review of the record, focusing on the nature of the offense and the character of the offender, *State v. Young*, 119 Idaho 510, 511, 808 P.2d 429, 430 (Ct. App. 1991). We will find that the trial court abused its discretion in sentencing only if the defendant, in light of the objectives of sentencing, shows that his sentence was excessive under any reasonable view of the facts. *State v. Charboneau*, 124 Idaho 497, 499, 861 P.2d 67, 69 (1993); *Brown*, 121 Idaho at 393, 825 P.2d at 490. Because sentencing decisions involve consideration of many intangibles and cannot be made with precision, where reasonable minds might differ as to the propriety of the term of confinement, the discretion vested in the sentencing court will be respected. *Toohill*, 103 Idaho at 568, 650 P.2d at 710.

## III.

## DISCUSSION

The sentencing hearing evidence disclosed that Windom's relationship with his mother began to deteriorate significantly several months prior to Judy's death. Windom bullied her into giving up the master bedroom and moving into the smallest bedroom in the house. He dominated the living room and took over the only other bedroom in the house as well. If Judy didn't immediately acquiesce to Windom's demands, he would scream at her, shove her, and intimidate her physically. Windom treated his mother as his servant and always got his way eventually. Judy purchased expensive clothes, colognes, and personal hygiene items for Windom even though money was tight. During the Christmas holiday immediately before Judy's death, Windom vented his frustrations with his mother to his brother. Windom told his brother, "that bitch is going to get what she deserves." Windom's brother had moved out of his mother's house several months prior to the murder at least in part to escape the escalating

violence and fighting between Windom and Judy. During another conversation with his brother, Windom bragged that he knew how to kill someone and then trick a psychologist into giving him a false diagnosis. Judy also confided in her friends about some of her troubles with Windom and expressed fear for her own safety. Windom locked Judy in her bedroom one day, and would not release the door to let her out. Judy spoke with Windom's father on multiple occasions and told him she feared that one day Windom would kill her in her sleep. Nevertheless, Judy continued to try to help Windom.

Windom was treated by several therapists to control his major depressive disorder and generalized anxiety disorder. Judy drove Windom to his therapy sessions, or provided taxi money so that Windom could attend. He did not miss any of his appointments in the months leading up to the murder. Windom told several people that his thoughts were out of control, that he felt like there was a monster inside him telling him to hurt other people. Windom's teachers at school were aware of his disturbing thoughts and were monitoring his behavior. However, Windom denied to his therapists that he was having suicidal or homicidal thoughts. Windom had become fascinated with lifting weights, and had bulked up his muscles using protein powders. In several short months, Windom attained an intimidating stature. Windom was also obsessed with studying psychology, including abnormal psychology, and was infatuated with serial killers. He especially emulated "Bateman," the main character from a book later made into a movie, "American Psycho." Windom purchased the same luggage and comforter, followed the same skin-care routine, and began to discuss the same topics Bateman discussed. Windom later told officers he admired psychopaths because they are "the smartest group of guys. And they're the most interesting. They have an exciting life."

According to his subsequent statements to police, on the day of the murder, Windom felt twitchy; he could not calm down. The urge to kill was becoming so strong, Windom needed to find a release. Windom took five times his prescribed dose of Klonopin, an anti-anxiety medication, in an attempt to quiet his anxiety, but it did not work. Windom later told detectives that he had been "thinking about going downtown and stabbing a couple of bums, too. They're worthless bums. . . . If she wakes up, she would have spoiled my plan. Besides, I was going to kill bums anyway. Why not add to the list." To prevent his mother from spoiling his plans, Windom loaded all of the weights onto one end of a dumbbell. He sneaked into Judy's bedroom and placed a gloved hand over her mouth to keep her from screaming. Then, using the weight

like a club, he bludgeoned her head. He hit her until he had no strength left in his arms. When officers discovered Judy's body several hours later, the damage was so severe that they could not identify her as having a face. After beating his mother, Windom stabbed her no less than thirty times because her brain was making a hissing or gurgling noise. He stabbed her in the heart and lungs at least sixteen times, and eventually cut her throat. When he was sure she was dead, Windom plunged a knife into Judy's brain and left it there for the police, like a prop.

Windom changed his clothes and washed Judy's blood off of his skin. He covered her body with a blanket, and put more blankets on the floor to cover the blood spatter. He dumped dog and cat food on the floor for their pets, and lit a candle in her room. Windom changed the message on their answering machine to inform people that he and his mother had left town for a week to deal with family problems in Washington. He called his best friend's girlfriend to tell her not to pick him up for school the next day, and locked up the house. In the middle of the night, Windom hitch-hiked and walked across town to his father's house, a distance of more than six miles. He then told his father that his mother was dead, and his father telephoned the police.

During his initial interview with police, Windom insisted that a stranger had entered their house and bludgeoned his mother to death, then forced Windom to stick the knife in her brain. Windom attempted to toy with the officers, goading them about their personal lives and mocking them with his superior intelligence. Once officers informed Windom that they did not believe his story and suspected he was involved in his mother's death, Windom began bartering bits of information for favors from the officers. He agreed to tell the truth if they would guarantee him a private cell. He interrupted his narrative to barter for his deodorant and other expensive personal hygiene items of the brand favored by "Bateman." During his confession, Windom was very calm and matter-of-fact. He smiled while he described killing his mother and exactly how it felt, snickering repeatedly over the gruesome details. When he was finished, he said he felt "nothing."

While incarcerated, Windom was evaluated by a psychologist, Dr. Craig Beaver, and a psychiatrist, Dr. Michael Estess. Both concluded that Windom was not suffering from depression and anxiety, but rather was a paranoid schizophrenic who had suffered a psychotic break shortly before killing his mother. Both doctors believed that if he had been properly diagnosed and treated, Windom would never have committed this brutal murder. Both doctors also concluded that Windom would be a good candidate for rehabilitation and probation. At the

4

sentencing hearing, Windom apologized to his family and his mother's friends for his actions. He expressed remorse for his conduct and recognized his need to take responsibility for his actions, despite the influence of his mental illness. Windom was sixteen years old when he committed the murder. Despite the recommendations of the doctors, the district court sentenced Windom to serve a determinate term of life imprisonment with no possibility of parole.

A determinate life sentence should be regarded as a sentence requiring a high degree of certainty--certainty that the nature of the crime demands incarceration until the perpetrator dies in prison, or certainty that the perpetrator never, at any time in his life, could be safely released. *State v. Perez*, 145 Idaho 383, 388, 179 P.3d 346, 351 (Ct. App. 2008); *State v. Eubank*, 114 Idaho 635, 638, 759 P.2d 926, 929 (Ct. App. 1988). This high degree of certainty is generally satisfied where the offense is so egregious that it demands an exceptionally severe measure of retribution and deterrence *or* if the offender so utterly lacks rehabilitative potential that imprisonment until death is the only feasible means of protecting society. *Eubank*, 114 Idaho at 638, 759 P.2d at 929. We begin by considering whether the lack of rehabilitative potential merits the sentence imposed.

At sentencing, the court discussed Windom's mental health history in detail including information provided by Windom's mental health providers prior to the murder and the evaluations performed by Dr. Beaver and Dr. Estess after the murder. In doing so, the court noted the disagreement among the providers regarding Windom's diagnosis and prognosis. Windom relies on Dr. Beaver's and Dr. Estess' opinions that he was previously misdiagnosed and that he would not be a threat to society if released on probation under proper supervision. Dr. Estess opined that Windom would be "compliant with treatment recommendations whether incarcerated or whether he was an outpatient in a more liberal set of social circumstances" based on his performance in jail. However, the district court rejected that reasoning, pointing out that Windom was receiving his anti-psychotic medication by injection in the jail, and therefore had no option but to comply. The court noted:

> There is absolutely no evidence to support that conclusion. And I say that because in the jail setting there have been a number of times--and I went through all of the medical records that were provided--over this period of time that they have continued to titrate the medications, going up and down adding new medications at various times because his alleged psychotic problems have not been fully taken care of.

Furthermore, when Dr. Estess and the other mental health people who were working with him in the jail attempted to get him to integrate with other juveniles or to go out into the yard and exercise at various times so that they could see how he would behave and they felt it would be better for his mental health status, instead Mr. Windom refused to do that, indicating that that's not what he wanted to do.

The district court erred in assessing Windom's rehabilitative potential by focusing almost exclusively on the treatment and response thereto by Windom while in the county jail. This ignores the comprehensive evaluations and conclusions of Dr. Estess and Dr. Beaver.

Dr. Estess noted that Windom had:

Articulated his concerns about his impulse control, his homicidal ideation, and his concerns about the internal loss of control of his external behavior, for some time prior to the incident. . . . It seems to me to be incredible that this young man's cries for help with thoughts and ideas that were absolutely beyond his control, were not recognized as the early signs and symptoms of a quite serious psychotic illness. . . . Ethan's pleas for help with his inappropriate, illogical paranoid and aggressive ideation were left wanting, because of the misinterpretation of its significant [sic] to others, that is family members and the professional persons that he consulted for his internal turmoil. Had Ethan received appropriate care and treatment from a psychiatric perspective, it is my opinion, that he would not now be in the contemporary set of legal circumstances that he is, and that he would have a biological mother who was still alive to care for him and be supportive of him.

Dr. Beaver concluded:

If, at some point Ethan Windom is given an opportunity to return to the community and is compliant with his mental health treatment, he does have a very good rehabilitation potential. He has average intelligence, extensive family support, and does not have any significant drug or alcohol abuse issues. I do not see evidence yet of any significant underlying personality disorders which would interfere with appropriate adjustment, which includes mental health care, if he were to transition back into the community at some point in the distant future.

The experts were firmly of the view that Windom has very good rehabilitation potential, in which case a determinate life sentence cannot be based on *certainty* that Windom never, at any time in his life, can be safely released.

The more difficult question is whether the egregious nature of the offense, standing alone, justifies the sentence imposed. *See State v. Cope*, 142 Idaho 492, 502, 129 P.3d 1241, 1251 (2006). The state argues that Windom did not murder his mother during a psychotic break, but planned to do so and planned to hide behind a faked or exaggerated mental illness when he did. The record reflects that Windom was fascinated by the study of psychology, serial killers,

6

and sociopaths. He emulated the fictional serial killer, Bateman from "American Psycho," wearing suits and carrying a briefcase beginning in eighth grade, and collecting Bateman figurines. Windom bragged that he could convince doctors he was psychotic even when he was not so as to avoid punishment for his actions. After an altercation with a classmate, Windom declared his intention to have himself committed to a mental hospital by pretending to be psychotic. He repeatedly informed the investigating officers that he was smarter than they were, smarter than all his friends, and smarter even than his idolized psychopaths.[1] When treated as though he was not smart by the detectives, Windom became enraged and confrontational. He bragged about getting into "smart people's heads" and knowing all the symptoms of schizophrenia. He also denied the possibility that he suffered from multiple personality disorder, scoffing that it "don't work." In the months prior to the murder, Windom frequently threatened his mother, causing her so much fear that she confided in his father that she was afraid he would kill her in her sleep.

At sentencing, the district court articulated in detail its reasons for imposing a determinate life sentence. The court considered the nature of the offense, Windom's mental health issues, and his relative youth, ultimately concluding this case fell within those described as so egregious that it demands an exceptionally high measure of retribution. *See, e.g.*, *State v. Stevens*, 146 Idaho 139, 149, 191 P.3d 217, 227 (2008) (upholding determinate life sentence in murder of eleven-month-old boy caused by beating the child's head against a hard surface); *Perez*, 145 Idaho at 388, 179 P.3d at 351 (upholding determinate life sentences for aggravated assault on ex-girlfriend and aggravated battery on a law enforcement officer where Perez chased and threatened to kill his ex-girlfriend and shot an officer multiple times at point-blank range to avoid capture); *State v. Leon*, 142 Idaho 705, 710-11, 132 P.3d 462, 467-68 (Ct. App. 2006) (upholding determinate life sentence where Leon murdered his estranged wife after violating a no-contact order by dragging her away from their children and shooting her three times, execution style); *State v. Sanchez*, 142 Idaho 309, 312-13, 323-24, 127 P.3d 212, 215-16, 226-27 (Ct. App. 2005) (upholding determinate life sentences for robbery and kidnapping because Sanchez and his co-conspirators hunted a defenseless and random victim, beating and stabbing

---

[1]     When asked if he was a psychopath, Windom responded that he was not, because "most of them are impulsive and I'm not impulsive." He then added that "you can't diagnose anyone under eighteen with psychopathy," and admitted he could not diagnose himself.

7

her before lighting her car on fire and leaving her for dead); *State v. Jensen*, 137 Idaho 240, 243-45, 46 P.3d 536, 539-41 (Ct. App. 2002) (upholding determinate life sentence for the first-degree murder of Jensen's husband's new girlfriend by injecting her with insulin and methamphetamine and watching over her while she suffered for several hours before she died); *State v. Williams*, 135 Idaho 618, 619-20, 21 P.3d 940, 941-42 (Ct. App. 2001) (upholding determinate life sentence for first degree murder of fellow drug dealer suspected of being a police informant where Williams beat the victim with a golf club and repeatedly ran him over with his own car while taunting and terrorizing him).

In *dicta*, the Idaho Supreme Court has implied that the nature of the offense, standing alone, may be sufficient to justify a determinate life sentence. *See Cope*, 142 Idaho 492, 129 P.3d 1241. In that case, Cope, forty-three years of age and with a long history of mental illness, murdered the victim by decapitating him with a knife. Cope then mutilated the victim's severed head. In his presentence report, Cope explained:

> "I hurd [sic] god say finish him off he's the mark of the beast. Get your knife and answer the door. And there was a man who I thought was the mark of the beast a black man mutated white and that's when I slit both sides of his neck and ran him down cut off his head and tossed it and [mutilated] it so he could not speak or hear. I had been taking a lot of benadryl and hearing voices."

*Cope*, 142 Idaho at 494, 129 P.3d at 1243. In affirming the sentence, the Court referenced Cope's history of non-compliance with his medication regimen and Cope's own expert's testimony that even if medicated, Cope still posed a threat to others. *Id.* at 502, 129 P.3d at 1251. The Court held that Cope had failed to show how anything less than a determinate life sentence could meet the objective to protect society. *Id.* The Court, reviewing Cope's criminal history that spanned more than twenty years in both California and Idaho, concluded rehabilitation was not a realistic possibility. *Id.* The Court ended by stating:

> This was a gruesome and horrifying crime that warrants the sentence imposed by the district court when all the appropriate information and factors are considered. It would be difficult to rationalize any other sentence.

*Cope*, 142 Idaho at 502, 129 P.3d at 1251.

Considering the case law history to date, involving the appropriateness of applying determinate life sentences, we arrive at the conclusion that the nature of the offense, standing alone, may be so severe and egregious so as to support the imposition of a determinate life

8

sentence.  Accordingly, we are constrained to affirm the imposition of a determinate life sentence in this case.

## IV.

## CONCLUSION

The district court did not abuse its discretion by imposing a determinate life sentence. Although Windom has shown that he may have the potential to be rehabilitated, the egregious nature of the crime supports the sentence imposed.  The judgment of conviction and sentence are affirmed.

Chief Judge LANSING and Judge PERRY **CONCUR**.